Oliver BUTTERWORTH et al., Plaintiffs,

v.

John DEMPSEY, Governor of the State of Connecticut, Ella T. Grasso, Secretary of the State of Connecticut, Donald J. Irwin, Treasurer of the State of Connecticut, and Raymond S. Thatcher, Comptroller of the State of Connecticut, Defendants.

**Civ. No. 9571.**

United States District Court
D. Connecticut.

Feb. 10, 1964.

Findings of Fact and Conclusions of Law; Judgment; Memorandum on Form of Judgment; and Memorandum on Motion to Intervene by Towns of Franklin and Salem Filed March 26, 1964.

Judgment Amended April 2, 1964.

Judgments Affirmed June 22, 1964.
See 84 S.Ct. 1913, 1918.

Donald F. Keefe, of Gumbart, Corbin, Tyler & Cooper, New Haven, Conn. (William L. F. Felstiner and Milton P. DeVane, of Gumbart, Corbin, Tyler &

Cooper, New Haven, Conn., on the brief), for plaintiffs.

Harold M. Mulvey, Atty. Gen. of Conn., Hartford, Conn., for defendants.

H. Meade Alcorn, Jr., of Alcorn, Bakewell & Smith, Hartford, Conn., and Prof. James Wm. Moore, New Haven, Conn. (Norman K. Parsells, Bridgeport, Conn., Ralph M. Shulansky, of Shulansky & Cohn, Hartford, Conn., and Ralph G. Elliot, of Alcorn, Bakewell & Smith, Hartford, Conn., on the brief), for intervenors A. Searle Pinney, J. Tyler Patterson, Jr., Frederick Pope, Jr., and Peter P. Mariani.

Leo Parskey, Hartford, Conn., for intervenor John M. Bailey.

Before J. JOSEPH SMITH, Circuit Judge, and ANDERSON and TIMBERS, District Judges.*

TIMBERS, District Judge:

### QUESTION PRESENTED

The question here presented is whether the Connecticut General Assembly as now constituted denies plaintiffs the equal protection of the laws guaranteed by the Fourteenth Amendment of the Constitution of the United States. We hold that the districting of the Senate and the apportionment of the House so debase the voting rights of plaintiffs in the choice of the members of both houses as to result in an invidious discrimination against plaintiffs who thereby are denied the equal protection of the laws.

### PARTIES TO THE ACTION

Plaintiffs are ten resident citizens and voters of Connecticut from six urban and suburban towns,[1] suing for themselves and other Connecticut voters similarly situated.

Defendants are the Governor, Secretary of the State, Treasurer and Comptroller of Connecticut, sued in their official capacities and particularly with respect to their duties in the holding of general elections to the legislature and in certifying the results of such elections. The Secretary of the State, in addition, is sued in her capacity as Commissioner of Elections representing all state and municipal election officials charged with

---

* The Court originally designated to hear and determine this case consisted of the late Circuit Judge CHARLES E. CLARK and District Judges ANDERSON and TIMBERS. After the death of Judge CLARK on December 13, 1963, Circuit Judge J. JOSEPH SMITH was designated to serve in the place of Judge CLARK. (See Ayrshire Collieries Corp. v. United States, 331 U.S. 132, 67 S.Ct. 1168, 91 L.Ed. 1391 (1947); cf. General Electric Co. v. Masters Mail Order Co., 244 F.2d 681, 682 n. 1, 687 (2 Cir. 1957)). Since the case was originally submitted solely on written evidence, the Court as presently constituted has heard and determined the case on the record submitted on the trial before the original Court, together with a transcript of the oral arguments therein, plaintiffs and intervenors having agreed to this procedure.
Prior to his death, Judge CLARK had written, but had not filed, a proposed opinion for the Court. Judge TIMBERS had voted to concur in the opinion, while Judge ANDERSON had voted to concur in part and to dissent in part. Judge CLARK'S opinion may well be regarded as an epilogue to a luminous and liberating life in the law, which he loved, lived, and led, and we include it as an Appendix to this opinion to indicate the guidelines which this Court intends to follow in formulating its decree.

1. Oliver Butterworth, Miriam Butterworth and S. Rains Wallace (Town of West Hartford, Fifth Senatorial District); Robert Beach and Charles Jacobson (Town of Manchester, Fourth Senatorial District); George Lucas (Town of East Hartford, Fourth Senatorial District); Bradley Morehouse and John Norman (Town of Fairfield, Twenty-fifth Senatorial District); David S. Maclay (City of Bridgeport, Twenty-first Senatorial District); Albert E. Holland (City of Hartford, First Senatorial District).
Based on the 1960 census, two of the plaintiffs reside in the cities with the largest populations in the State (Hartford, 162,178 and Bridgeport, 156,748), each of which has two representatives in the House; two reside in the heaviest populated senatorial districts in the State (Twenty-fifth, 175,940 and Fifth, 173,953), each of which has one senator in the Senate.

duties in the holding of general elections to the legislature.

Other resident citizens and voters were permitted to intervene, including the chairmen of the Republican and Democratic State Central Committees who were permitted to intervene as individuals, not as political leaders.

## CLAIMS OF THE PARTIES

Plaintiffs in their complaint seek (i) a declaratory judgment that their constitutional rights are impaired by the malapportionment[2] of both houses of the General Assembly; (ii) injunctive relief against the holding of general elections, other than elections at large, to the General Assembly in 1964 until the House has been reapportioned and the Senate redistricted so as not to impair plaintiffs' constitutional rights; and (iii) such further relief as may be just and equitable. Plaintiffs also filed, and pressed at the hearing, a motion for partial summary judgment claiming at this time only the declaratory judgment prayed for in the complaint.

Defendants in their answer and at the hearing took no position with respect to the critical issues in the case but did request an opportunity to comply with any decree entered by the Court.

Intervenor Bailey supports generally the position of plaintiffs, claiming malapportionment of both Senate and House.

The Pinney intervenors admit malapportionment of the Senate; but they vigorously assert that apportionment of the House based upon the principle of unit representation, using the towns as local units, complies with the Constitution of Connecticut and does not violate the Constitution of the United States, so long as the Senate is based on the principle of equality of population. The Pinney intervenors also filed, but did not press at the hearing, a motion to dismiss the complaint for failure to state a cause of action, questioning the power of this Court to declare invalid a legislative apportionment system embodied in a state constitution.

## JURISDICTION

■ This Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. §§ 1983, 1988 and 28 U.S.C. § 1343(3) and (4).

Since the action draws into question provisions of the statutes and Constitution of Connecticut, a special statutory district court of three judges was convened to hear and determine the case pursuant to 28 U.S.C. §§ 2281–2284.

## HEARING AND RECORD

The Court held a hearing on October 22, 1963, at which counsel were heard on the motion for partial summary judgment as well as on the merits of the case. No oral evidence was presented.

The record before the Court consists of the pleadings; facts established by stipulation and by requests for admissions pursuant to Rule 36, Fed.R.Civ.P.; and affidavits.

After the death of Judge CLARK and the designation of Judge SMITH in his place, counsel agreed that the Court should hear and determine the case on this record including a transcription of the oral arguments, which course has been followed.

## THE SENATE

■ Under the Connecticut Constitution adopted in 1818 and amendments thereto, the legislature consists of a bicameral General Assembly. The upper house, the Senate, is comprised presently of 36 members.

Article Third, Section 5, adopted in 1901, raised the minimum number of Senate districts to 24, the maximum to 36. The last general redistricting was in 1903 when the General Assembly divided the State into 35 districts. A thirty-sixth district (Greenwich) was add-

---

2. Strictly, the correct terms are "districting" of the Senate and "apportionment" of the House. To avoid redundancy, however, we shall refer occasionally in this opinion to the apportionment or malapportionment of both houses of the General Assembly.

ed in 1941. Aside from the addition of the thirty-sixth district in 1941 and some shifting of boundaries in New Haven, there has been no valid redistricting of the Senate since 1903, more than 60 years, despite numerous legislative proposals.

Article Third, Section 5, also provides that in districting the Senate, "regard shall be had to population in the several districts, that the same may be as nearly equal as possible under the limitations of this section." The limitations referred to are that Senate districts shall always be composed of contiguous territory; that neither the whole nor a part of one county shall be joined to the whole or a part of another county to form a district; that no town shall be divided unless for the purpose of forming more than one district wholly within the town; and that each county shall have at least one senator.

In 1953 the General Assembly enacted legislation to redistrict the Senate. The Connecticut Supreme Court of Errors struck down this legislation, holding mandatory that provision of Article Third, Section 5, which allows only that session of the General Assembly next after completion of the United States census to redistrict the Senate. Cahill v. Leopold, 141 Conn. 1, 103 A.2d 818 (1954).

Measured by any of the recognized standards, the malapportionment of the Senate is clearly demonstrated.[3] The disparity between the most populous district (the Twenty-fifth with 175,940 inhabitants) and the least populous district (the Tenth with 21,627 inhabitants) is in a ratio of eight to one.[4] Based upon a 1960 state population of 2,535,234, the norm for each Senate district is 70,423, from which the deviations in the present districting of the Senate are striking: the average population of the five most populous districts is 159,721 (compared with the norm of 70,423), indicating a deviation of 226.8% from the norm; the average population of the five least populous districts is 28,722, or 40.8% of the norm; of the 36 districts, 25 deviate more than 25% from the norm, 17 below and 8 above.[5] A majority of the Senate is

3. The statistical analysis of population and representation results in this paragraph, substantially undisputed mathematically, is based on the Naess Affidavit submitted in support of plaintiffs' motion for partial summary judgment.

4. The ratio of disparity between the most populous and least populous districts has been applied as a standard for measuring malapportionment in Mann v. Davis, 213 F.Supp. 577, 581 (E.D.Va.1962), pending on appeal (No. 69, this Term); Thigpen v. Meyers, 211 F.Supp. 826, 829 (W.D.Wash.1962), pending on appeal (No. 381, this Term); League of Nebraska Municipalities v. Marsh, 209 F.Supp. 189, 193 (D.Neb.1962); Sobel v. Adams, 208 F.Supp. 316, 317, supplemental opinions, 208 F.Supp. 316, 214 F.Supp. 811 (S.D.Fla.1962), pending on appeal sub nom. Swann v. Adams (No. 297, this Term); Sims v. Frink, 208 F.Supp. 431, 440 (M.D.Ala.1962), pending on appeal sub nom. Reynolds v. Sims (Nos. 23, 27, 41, this Term); Lisco v. McNichols, 208 F.Supp. 471, 477 (D. Colo.1962); Moss v. Burkhart, 207 F.Supp. 885, 891 (W.D.Okla.1962), pending on appeal sub nom. Williams v. Moss

(Nos. 476, 534, 546, this Term); Toombs v. Fortson, 205 F.Supp. 248, 250 (N.D. Ga.1962); Sanders v. Gray, 203 F.Supp. 158, 170 n. 10 (N.D.Ga.1962), judgment vacated and case remanded on other grounds, 372 U.S. 368, 381, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350, 355 (1962), reversing 360 Mich. 1, 104 N.W. 2d 63 (1960), upon remand from 369 U.S. 429, 82 S.Ct. 910, 8 L.Ed.2d 1 (1962), pending on appeal sub nom. Beadle v. Scholle (No. 24, this Term); Sweeney v. Notte, 183 A.2d 296, 301 (R.I.1962).

5. Deviations from the "norm" (a term representing the product of dividing the total state population by the number of seats in the legislative body) have been utilized in analyzing claims of malapportionment in Mann v. Davis, supra note 4, at 581; Thigpen v. Meyers, supra note 4, at 830; Wisconsin v. Zimmerman, 209 F.Supp. 183, 186 (W.D.Wis.1962); Moss v. Burkhart, supra note 4, at 893; Baker v. Carr, 206 F.Supp. 341, 345 (M.D.Tenn. 1962), upon remand from 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), remanding 179 F.Supp. 824 (M.D.Tenn.

elected by 31.9% of the total population; the 17 districts 25% or more below the norm contain 27.6% of the population and elect 47.2% of the Senate membership; the 8 districts 25% or more above the norm contain 43.9% of the population and elect 22.2% of the Senate membership.[6]

Obviously the present districting of the Senate deviates sharply from the requirement of districts of approximately equal population contemplated by the Connecticut Constitution. All parties agree that the Senate must be redistricted.

With respect to the Senate, we hold:

(1) That the present districting of the Senate so debases the voting rights of plaintiffs as to result in an invidious discrimination against plaintiffs who thereby are denied the equal protection of the laws;

(2) That the Senate must be redistricted promptly in such a way as to achieve substantially equal weighting of the votes of all voters—in accordance with the guidelines indicated in Judge CLARK'S opinion[7] and pursu-

ant to a decree to be formulated by this Court;[8]

(3) That in so redistricting the Senate, the limitations in Article Third, Section 5, of the Connecticut Constitution, in view of the supremacy clause of the Constitution of the United States,[9] cannot bar action to comply with federal constitutional requirements.[10]

### THE HOUSE

The House consists of 294 representatives.[11] Each of the 169 towns, the basic local governmental subdivision in the State, has either one or two representatives in the House.

The town unit basis for representation in the House is found in Article Third, Section 3, of the Connecticut Constitution. Each town with more than 5,000 inhabitants is entitled to two representatives. Each new town must have a population of at least 2,500 before being entitled to one representative; prior to reaching a population of 2,500, new towns are treated as voting districts of the towns from which they were set off, for the purpose of electing the representative or representatives to which the

---

1959); Maryland Committee For Fair Representation v. Tawes, 228 Md. 412, 421–422, 180 A.2d 656, 660–661 (1962), pending on appeal (No. 29, this Term); Sweeney v. Notte, supra note 4, at 301.

6. The percentage of population which may elect a majority or other percentage of the legislative body has been considered relevant to the issue of malapportionment in Thigpen v. Meyers, supra note 4, at 831; Wisconsin v. Zimmerman, supra note 5, at 186; Sims v. Frink, supra note 4, at 438; Lisco v. McNichols, supra note 4, at 475; Moss v. Burkhart, supra note 4, at 893; Toombs v. Fortson, supra note 4, at 251; Maryland Committee For Fair Representation v. Tawes, supra note 5, at 436, 180 A.2d at 669.

7. Appendix, p. 773.

8. Infra p. 764.

9. U.S.Const. art. VI, cl. 2.

10. In Valenti v. Dempsey, 211 F.Supp. 911, 913 (D.Conn.1962), this Court held

that state constitutional limitations cannot bar relief required by the federal constitution:

"* * * under Baker v. Carr * * * [plaintiff] is pressing a federal constitutional right; and if he is correct in his federal constitutional claim, the state constitutional limitation need not be construed as a bar, for no state limitation on legislative action can prevent relief which the Federal Constitution, as construed by the Supreme Court, requires."

We hold that the decision of the Supreme Court of Errors in Cahill v. Leopold, 141 Conn. 1, 103 A.2d 818 (1954), cannot bar or delay prompt redistricting of the Senate to comply with federal constitutional requirements.

11. The Connecticut house is the largest state legislative body in the United States, except for the New Hampshire house.

parent town is entitled. Towns which had two representatives when the Connecticut Constitution of 1818 was adopted retain the right to that number.[12]

The town with the largest population (Hartford, 162,178) has the same number of representatives—2—in the House as the smallest town (Union, 383).[13] The vote of a resident of Union is weighted 424.5 times as heavily as the vote of a resident of Hartford.[14] Based on the 1960 state population, the norm for each town is 8,623, from which the deviations in the present apportionment of the House are substantial: representatives of the ten most populous towns and cities each represent an average of 49,441 people, or 573.4% of the norm; representatives of the ten least populous towns each represent an average of 629 people, or 7.3% of the norm; of the 169 towns, only 23 deviate less than 25% from the norm; of the remaining towns, 119 have populations per representative 25% or more below the norm, 27 have populations per representative 25% or more above the norm.[15] A majority of the House is elected by 11.9% of the total population; the 27 towns having populations per representative 25% or more above the norm contain 64.2% of the population and elect 18.3% of the House membership; the 119 towns having populations per representative 25% or more below the norm contain 20.4% of the population and elect 66% of the House membership.[16]

None of the parties to this action seems seriously to support the existing House apportionment. It discriminates between voters in towns of large population; between voters in towns of small population; and, through the grand-father clause, between voters in small towns of similar size.

Plaintiffs contend that the present House apportionment results in an invidious discrimination against inhabitants of urban and suburban towns in favor of inhabitants of smaller towns without logical relation to any justifiable classification of voters represented in the House. Intervenor Bailey supports plaintiffs' contention.

The Pinney intervenors contend for preservation of so much of the House plan of apportionment as gives recognition to the town as a unit of representation by giving to each town equal representation in the House.

In Connecticut the town rather than the county has been the basic local unit of government; for all practical purposes the county as a unit of government has been abolished. The town, however, is not in any sense independent. New towns may be created by the legislature and often have been (as late as 1921) by taking territory from one or more existing towns. Forms of government in towns have changed. Some retain the old town meeting; some have adopted a representative town meeting; some have council-manager forms of government; some have incorporated as cities or have cities within their borders; some contain or contained boroughs with governmental functions, fire, water, school and other limited purpose taxing districts; some have combined with other towns in districts for some purposes. The tendency of modern times has been to grant a large measure of autonomy to the people of the towns to choose and change their form of management of local affairs. Ultimate control, however, remains with the legislature.

12. This is referred to as the "grandfather clause".

13. The statistical analysis in this paragraph is based on the Naess Affidavit, supra note 3.

14. Supra note 4.
 This ratio of disparity of representation between the most populous and least populous towns is the highest of any state legislative house in the United States, except for Vermont where the apportionment of both houses has been challenged. Buckley v. Hoff, Civil No. 3653, D.Vt. (Complaint filed January 22, 1963; hearing held October 29 and 30, 1963; not yet decided).

15. Supra note 5.

16. Supra note 6.

In earlier days when the towns were largely self-sufficient, distant from one another in time of travel, relatively equal in population and in contribution to the common defense and in support of the established church, when indeed the cost of sending more than one representative to a legislative body was a problem to some communities, there were persuasive considerations that might overbalance the desirability of a strict "one man, one vote" plan of representation.

█ The Pinney intervenors in their defense of the "unit principle" rely primarily upon history, and the failure to change, as justification for the present discrimination in the House.[17] They must admit—aside from the fact that the unit principle in its purest form of equal representation of each town has never been the law of Connecticut—that historical inertia has led not to a defensible unit representation but to one logically indefensible in its two to one discrimination between units of the same size and character.

█ Reliance by the Pinney intervenors on the so-called "federal analogy" is likewise, in our view, misplaced. The Connecticut Compromise did permit representation in the United States Senate to be based on the states as geographical units, with representation in the United States House of Representatives to be based on population. But the discrimination permitted by the Connecticut Compromise between voters of the states in the indirect choice of senators was necessary to obtain adherence of sovereign states to the Union. After failure of the federal system of the Confederation —one vote, one state—the convention, seeking to improve the Articles of Confederation, was divided between advocates of a purely national government and advocates of the existing federal scheme in strengthened form. The compromise, suggested by the Connecticut delegates and eventually adopted, combined "national" and "federal" features; the provision for Senate representation by states was necessitated—when approval of the Constitution hung in doubt —by having to obtain adherence of the smaller states to the Union. There is no such problem within this or other states. The government of each state is supreme within the state except to the extent it has relinquished some of its powers to the United States. No state is a federal union of sovereign towns or counties.

█ The Pinney intervenors further argue that unit representation in the House is necessary to the existence of a bicameral legislature; that if representation in both houses were based on population "all purpose and reason for maintaining a bicameral state legislature would be destroyed"; and that "the principle of unicameralism—so long shunned by all but one of our states—would be not only more logical but also more economical." We disagree. This argument flies in the face of the experience of many other states, including our neighbor Massachusetts where representation in both houses is based on population. Generally, representatives in the less numerous branch speak for wider areas and of course a more numerous constituency; they can be expected to be less parochial than the representatives of the smaller constituencies of the more numerous house; and such factors as differing lengths of term, staggered terms and age limitations may further differentiate the two bodies.

█ Underlying the entire position of the Pinney intervenors in defending the principle of the town as a unit of representation in the House is the claim that such unit representation is rational because necessary to prevent a city majority from tyrannizing a small town minority in the legislature.[18] This claim we emphatically reject.

---

17. See Judge CLARK'S opinion for a brief summary of the history of apportionment in the House. Appendix, p. 769.

18. The Pinney intervenors say in their brief (pp. 41–2):
"* * * What is the policy behind the system of unit representation in

The equal protection clause of the Fourteenth Amendment provides that "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." [19] In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962), where plaintiffs (as in the instant case) alleged denial of equal protection of the laws through malapportionment of a state legislature resulting in debasement of their votes, the Supreme Court held (369 U.S. 186, 237):

"The right asserted is within the reach of judicial protection under the Fourteenth Amendment."

The "right asserted" there, as here, should be kept clearly in mind. It is the citizen's right to an effective vote free of arbitrary impairment by the state. The equal protection clause is not concerned with desires to perpetuate political philosophies, geographical entities, historical anomalies. It is equally and impartially unconcerned with the protection of *any* minority, save one: the minority of one embodied in the individual citizen.

When the "right asserted" is kept in focus, the remedy to vindicate that right becomes clear. In the context of this case, it is to afford equality, insofar as possible, to the efficacy of all men's votes in the election of their legislative representatives. Unless all voters have an equal voice in the election of those who make the laws, equal protection in the formulation of those laws cannot be guaranteed to all voters.

Justices Black and Douglas, dissenting in South v. Peters, 339 U.S. 276, 279, 70

S.Ct. 641, 643, 94 L.Ed. 834 (1950), put it this way:

"The creation by law of favored groups of citizens and the grant to them of preferred political rights is the worst of all discriminations under a democratic system of government."

In Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), the Court squarely rejected the argument that votes in rural areas could be weighted more heavily than votes in urban areas in choosing a governor [20] (372 U.S. 368, 379):

"Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit."

The Court went on in Gray v. Sanders to say (372 U.S. 368, 379–381):

"The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications.

* * * * * *

"The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote."

The contentions of the Pinney intervenors, which have been urged with

the Connecticut House? It is nothing less than the protection of the little from the big. * * * [T]he system was designed to prevent that tyranny of the majority whereby the large and populous urban centers could, by indifference or design, ride roughshod over the needs and desires of the less populated communities. It was an attempt to protect the minority rights of those who, absent a system of unit representation in one house of the legislature, would be

penalized for choosing to live elsewhere than a city. * * * "

19. U.S.Const. amend. XIV, § 1.

20. While Gray v. Sanders is not decisive on all aspects of state legislative apportionment cases, its condemnation of weighting votes in rural areas more heavily than votes in urban areas in choosing a governor applies in principle to choosing a legislature.

force and eloquence, cannot be lightly brushed aside. In a State whose legislature antedates the Constitution of the United States by a century and a half and whose delegates to the constitutional convention contributed so vitally to the basic structure of our federal government, history is important. Likewise, such matters as the increasing autonomy granted to Connecticut towns and the position of eminence achieved by the legislature of Connecticut in various fields of endeavor, are entitled to careful consideration.

In exercising the judicial duty imposed upon us by Baker v. Carr, supra, with respect to questions once thought to be purely political, we have weighed with care each of the arguments advanced concerning the apportionment of the House. We conclude that application of the unit principle either in its present adaptation in Connecticut or in its pure form results or would result in such great disparities of voter representation in the House as to violate plaintiffs' constitutional rights.

The Supreme Court has not said, nor do we, that perfect numerical equality of population in voting districts is necessary to equal protection of the laws. But mere historical existence of towns or cities as local units of government of varying ages does not constitute a logical or rational basis for discrimination between inhabitants of such units as voters represented in the House. Since we find no logical or rational basis for the existing apportionment, and the vast disparity between the weight of votes of electors of the various towns greatly debases the franchise of those in towns of larger population, invidious discrimination is plainly shown.

With respect to the House, we hold:

(1) That the present apportionment of the House so debases the voting rights of plaintiffs as to result in an invidious discrimination against plaintiffs who thereby are denied the equal protection of the laws;

(2) That the House must be reapportioned promptly in such a way as to achieve substantially equal weighting of the votes of all voters—in accordance with the guidelines indicated in Judge CLARK'S opinion [21] and pursuant to a decree to be formulated by this Court;[22]

(3) That in so reapportioning the House, no state constitutional or statutory limitations (including Article Third, Section 3, of the Connecticut Constitution), in view of the supremacy clause of the Constitution of the United States,[23] can bar action to comply with federal constitutional requirements.[24]

## FORMULATION OF DECREE AND FURTHER PROCEEDINGS

Mindful that the foregoing decision on the issues presently before us is hardly more than the beginning of our task, we intend to proceed promptly with the formulation of a decree and the execution thereof.

Counsel are requested to settle a decree as follows:

(1) Not later than March 2, 1964, counsel will serve and file their proposed forms of decree, accompanied by supporting memoranda.

(2) Not later than March 9, 1964, counsel will serve and file any objections to the proposed forms of decree, together with answering memoranda.

(3) On March 16, 1964, at 10:30 A.M., in the second floor courtroom of the United States Courthouse, New Haven, the Court will hear arguments by counsel

21. Appendix, p. 773.

22. Infra, p. 764.

23. U.S.Const. art. VI, cl. 2.

24. Valenti v. Dempsey, supra note 10, at 913.

on the proposed forms of decree,. following which the Court will enter an appropriate decree.

In submitting their proposed forms of decree, counsel are requested, in addition to complying with the foregoing opinion of the Court, to consider:

(a) The guidelines indicated by Judge CLARK for redistricting the Senate and reapportioning the House so as to bring both within federal constitutional dimensions.[25]

(b) The advisability of the Court's appointing a special master, pursuant to Rule 53, Fed.R.Civ. P., to hold hearings under instructions from the Court with respect to the details of redistricting the Senate and reapportioning the House and to report to the Court with reasonable promptness thereon.

(c) The feasibility of utilizing an appropriate electronic computer technique to minimize partisanship in the redistricting and reapportionment ordered by the Court.[26]

(d) The advisability of some procedure for assuring periodic reapportionment of the General Assembly to keep it currently within constitutional dimensions.

(e) The stage in the proceedings at which the decree should be made appealable.

 For obvious reasons we would prefer to have the necessary redistricting of the Senate and reapportionment of the House done by or under the direction of the General Assembly than by the Court. But the hour is late. And we cannot blind ourselves to the deadlock of many years within the legislature over the issue. Hardly a year ago this Court invited the Governor and General Assembly to cooperate with and assist the Court "toward solving probably the most difficult governmental problem of our age." [27]

The 1963 session of the legislature adjourned without acting on the problem.

We therefore feel constrained to proceed without further delay with the schedule outlined above to formulate and execute our decree, absent prompt legislative action. We shall continue, however, to hope for legislative action. And if at any time the Governor should call the General Assembly into special session for the purpose of formulating plans to redistrict the Senate and reapportion the House, and if the General Assembly gives evidence satisfactory to this Court of its intention to act to bring the representation in both houses within federal constitutional dimensions, we shall gladly stay further proceedings in this Court to give the legislature a reasonable opportunity to perform the duty which is rightly that of the legislature to perform. In this connection we renev' the invitation which Judge Clark extended on December 20, 1962: [28]

"And we trust the court can also count on the co-operation and assistance of the Chief Executive and the General Assembly in reaching for the correct solution. Indeed we are happy that, under the settled principles of law we are following, we need not view the state organs of government as adversaries to be given harsh mandates, but can instead look for their co-operative effort toward solving probably the most difficult governmental problem of our age."

 We wish to express our appreciation for the unusually able assistance we have received from counsel for all parties. Their briefs and other papers,

25. Appendix, p. 773.

26. Weaver and Hess, A Procedure For Nonpartisan Districting: Development of Computer Techniques, 73 Yale L.J. 288 (1963).

27. Valenti v. Dempsey, supra note 10, at 913.

28. Ibid.

as well as their oral arguments, have been of an extraordinarily high order and have helped the Court immeasurably in a difficult case. We are confident that we can count on counsel for continued competent assistance in the even more difficult aspects of this case which lie ahead. We especially invite counsel, the parties and all others concerned to join the Court in approaching the problems to which our decision today gives rise, not as residents of particular towns, not even primarily as residents of Connecticut, but first and foremost as Americans—resolved that fundamental federal constitutional guarantees shall be secured by prompt and practical application in our State.

## CONCLUSION

Let judgment enter granting plaintiffs the declaratory judgment prayed for in the complaint; denying plaintiffs' motion for partial summary judgment as moot; and denying the Pinney intervenors' motion to dismiss for failure to state a cause of action.

J. JOSEPH SMITH, Circuit Judge (concurring).

I concur in Judge TIMBERS' opinion and would add only a brief statement. The great disparity between the effective weight of voters in choosing legislators in different senatorial districts and towns shows a marked discrimination against those in the districts and towns of larger population. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) has established that such a discrimination raises a question of deprivation of equal protection of the laws in violation of the Fourteenth Amendment of the Constitution of the United States which it is the duty of the federal courts to resolve if the legislature and the state courts fail to do so. On the showing made here, no compelling reasons for so wide a discrimination having been shown, the court must find that the discrimination is invidious and a violation of the constitutional rights of the plaintiffs. No case yet decided in the other states is fully comparable on the facts, although Sweeney v. Notte, R.I., 183 A.2d 296, which invalidated the Rhode Island legislative structure is perhaps the closest, since there the basic unit in the lower house was also the town. There it was suggested that the legislature set up districts composed of groupings of the smaller towns, or so increase the size of the House that proportional representation could be accomplished while retaining a representative for each town. The latter alternative would of course be impractical in our case because of the great increase of members required in a body already composed of 294 members. Districts can, however, undoubtedly be designed to assure representation of points of view of rural, urban and suburban electors, if indeed such separate points of view exist, while giving equal weight to the votes of individual electors in the choice of the membership of the House. I take it that while exact equality of population of every representative or senatorial district is not required, and some room remains for weighting other factors than population, such as contiguity and compactness, deviations from substantial equality are to be the exceptions, and the showing of necessity therefor plain. No convincing showing of necessity has been made. I would therefore follow the general outline for relief proposed by Judge TIMBERS and the late Judge CLARK.

## APPENDIX

### [OPINION OF THE LATE CIRCUIT JUDGE CHARLES E. CLARK]

CLARK, Circuit Judge.

Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, opened a new era of federal judicial responsibility in its holding that an assertion of constitutional right as impaired by the malapportionment according to population of representatives in state legislatures presented a justiciable issue, to be passed upon by the federal courts. Prior to that decision it had been held or assumed that

this was a "political question" not to be considered by the judiciary. The announcement of the decision, however, brought forth an immediate response from voters all over the country, so that already some 44 actions in 39 of the 50 states are pending to test the constitutionality of state legislative apportionments. This action tests the Connecticut system as instanced in both Houses of the Connecticut General Assembly. It is not merely new and strange territory into which we, in common with our federal judicial colleagues generally, must now venture; but it is an awesome responsibility, the difficulties and uncertainties of which we are fully conscious. But it is quite clear that it is one upon which we cannot turn our backs.

The plaintiffs are ten voters from six different urban towns [1] of the State, suing for themselves and others similarly situated, who assert that they are denied the equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution by reason of the malapportionment, and consequent discrimination against them, of representatives in both the Senate and the House of Representatives. The defendants are the Governor of the State and other high officials, including the Secretary of State, who is also the Commissioner of Elections and who is sued as representative of all officials, state and municipal, charged with duties pertaining to the holding of general elections. Relief sought is a declaratory judgment holding the plaintiffs' constitutional rights violated by the malapportionment of both the House and Senate, together with injunctive relief against the holding of general elections, other than elections at large to the Senate and House in 1964, until such reapportionment is had as will not impair the plaintiffs' constitutional rights. The Attorney General answered on behalf of the defendants, but the real burden of defense has been assumed by intervenors whose petitions for interven-

tion were allowed by this court. Jurisdiction in this court is clear under 42 U.S.C. §§ 1983, 1988, and 28 U.S.C. § 1343(3, 4). Since the action brings in question statutes as well as constitutional provisions of the State, a special statutory court of three judges has been convened by order of the Chief Judge of the Circuit, pursuant to 28 U.S.C. §§ 2281 et seq., to hear the case.

In their complaint the plaintiffs make specific allegations of malapportionment of both the Senate and the House. Intervenors Pinney, chairman of the Republican State Central Committee, and three associates admit the malapportionment of the Senate, but vigorously assert that the election of members of the House is legal and valid. Intervenor Bailey, chairman of the Democratic State Central Committee, admits the malapportionment of both Houses and essentially joins forces with the plaintiffs. The parties have followed the suggestion of the court to agree on the facts—which, indeed, are well known—and to present such expert and other evidence upon which they rely in written form, so that the case has been fully submitted on the merits and full oral argument had supplementing the briefs. The presentation has been of an unusually high order; and the court wishes to express its deep sense of obligation to counsel for so thoroughly and carefully initiating it into ground-breaking territory. As it turns out, the issue here becomes a comparatively narrow one, although of great importance; it appears in somewhat similar, although far from identical, form in some, though not all, of the cases pending elsewhere. As framed by the Pinney intervenors, it is whether or not the House may legally choose its representatives according to what they term the "unit principle," relying on town areas, so long as in one body, here the Senate, there is followed the principle of equality of population.

Before we turn to a detailed consideration of this contention, it is well to state

---

1. The towns are East Hartford, Fairfield, West Hartford, Manchester, Bridgeport, and New Haven, ranging in size populationwise from the 156th to the 169th or largest in the State.

what appears to be common ground. First with respect to the Senate there is no question but that its apportionment is based primarily on population. This was established in 1901 by Article Third, Section 5, of the Connecticut Constitution, which raised the minimum number of Senate Districts to 24, and the maximum to 36. Power to redistrict was vested in the General Assembly convening next after the completion of a United States census. The last general redistricting was had in 1903, when the General Assembly divided the State into 35 districts, becoming 36 in 1941 with the addition of the district of Greenwich. Section 5 provides that "regard shall be had to population in the several districts, that the same may be as nearly equal as possible under the limitations of this section." The limitations which follow are that senatorial districts shall always be composed of contiguous territory, that neither the whole nor a part of one county shall be joined to the whole or a part of another county to form a district, and that no town shall be divided unless for the purpose of forming more than one district wholly within the town. An attempt of the legislature in 1953 to redistrict the Senate was struck down by the Connecticut Supreme Court of Errors in Cahill v. Leopold, 141 Conn. 1, 103 A.2d 818, upon the ground that Section 5 allowed only that session of the General Assembly immediately following the taking of the census to redistrict. Outside of this abortive effort nothing has been done in sixty years, although legislative proposals have been numerous. The difficulties of following the constitutional formula are obvious; in addition there appears to have been an understandable reluctance of Democratic leaders to support redistricting the Senate while the Republican hold on the House through its rural vote continues. Admittedly the malapportionment of the Senate is now substantial.[2]

Turning to the House we find that it now numbers 294—the largest state house except one, New Hampshire. And the malapportionment of representation based upon population is striking—indeed is said to be one of the most extreme of any state. Thus the Town of Union, with a population of 383, has 2 representatives, or the same number as the largest cities: Hartford (162,178) and Bridgeport (156,748). The vote of a resident and voter of Union is thus weighted 424.5 times as heavily as the vote of a resident and voter of Hartford. This striking disproportion is carried out generally through the 169 towns, as is more fully illustrated in the footnote.[3] Indeed

2. Taking the 1960 census with a state population of 2,535,234, the average or norm for the 36 districts is 70,423. But the average population of the five most populous districts (ranging from 175,940 down to 144,160) is 159,721 or 226.8% of the norm; while the average population of the five least populous districts (ranging from 21,627 up to 32,534) is 28,722 or 40.8% of the norm. Nineteen Senators—a majority—are elected by Senatorial Districts having a population of 811,242 or 31.9% of the total state population. Seventeen of the 36 districts have populations 25% or more below the norm; 8 districts have populations 25% or more above the norm, etc. It should be noted that it seems virtually impossible to obtain fairly equal districts if the constitutional limitations are to be observed. For example, Stamford is underrepresented and Waterbury is overrepresented; but attempts to change this seem likely merely to reverse this situation. And the county restriction adds its own complications. All the parties agree that redistricting of the Senate should be had without these hampering limitations.

3. The population of the 10 most populous towns and cities, 988,818, represents 39% of the total population of the State and elects 20 representatives or 6.8% of the total number; while the population of the 10 least populous towns, 7,554, represents 0.3% of the total population and elects 12 representatives or 4.1% of the total. Towns having a population of 301,485 or 11.9% of the total elect 148 or a majority of the House. One hundred nineteen (119) of the 169 towns have populations per representative 25% or more below the "norm" (see note 2 supra) of 8,623. These towns have a population of 518,647 or 20.5% of the total, but elect 194 representatives, or

there can be little doubt, as is substantially conceded, that if equality of population is to be the test the House is grossly malapportioned. The real defense of the Pinney intervenors comes in their argument for the validity of the "unit principle."

Now it should be noted that the unit principle in what we must assume as its purest form of one representative to each town has never been the law of this State. It has always been diluted in a substantial way because of history and because of population to achieve a result for which a theoretical basis is hard to discover. Going back in our history, the Fundamental Orders of 1638–9, Section 8, provided representation in the unicameral legislature according to population. The three original towns of Hartford, Windsor, and Wethersfield were to send "four of their Freemen" as their deputies to every General Court, and new towns were to send "so many deputies as the Court shall judge meet, a reasonable proportion to the number of Freemen that are in the said towns." Colonial Records of Connecticut, 1636–1665, 20, 24. The Charter of 1662, granted by Charles II, set the basic pattern in existence today, providing that the General Assembly should have not more than two persons from each town. Statutes of Connecticut, 1808, 3. In 1698 the second house was added. The pattern for apportionment for the House continued until the Constitution adopted in 1818, which provided in Article III, Section 3, that in the House existing towns should have the same number of representatives "as are at present practised and allowed;

new towns, formed after the adoption of the Constitution, should have one". This is the forerunner of the present provision, Article Third, Section 3. Two modifications of the system have been made. By constitutional amendment in 1874 every town having more than 5,000 was given two representatives, while in 1876 the requirement was added that new towns must have a population of at least 2,500 before becoming entitled to one representative.

Thus it will be observed that the system of apportionment for the House goes back two centuries without fundamental change populationwise, although proposals by commissions and others for changes by constitutional conventions and otherwise have been too numerous to note here. And there has been no change of any kind since 1876, although the malapportionment according to population has steadily worsened. The provision that the towns shall retain the representation they had in 1818 explains why Union and some 32 other towns of present population under 5,000 still have two representatives, while 44 other towns of similar population have only one. The prohibition against more than 2 representatives per town shuts off more representation of the large cities; while the grant of one more representative when a town attains a population of 5,000 assures a constantly increasing house, as does the possibility of the legislative creation of new towns as soon as the new entity attains a population of 5,000. That is why the present number is 294, as compared to 279 in 1959, 255 in 1903, and 203 in 1821.

66% of the House. Twenty-seven of the 169 towns have populations per representative 25% or more above the norm; they have a total population of 1,626,794 or 64.2% of the total and elect 54 representatives or 18.4% of the total.

In the New York Times for Nov. 11, 1963, Section 1, pp. 1, 36, Anthony Lewis has a summary of the apportionment situation in each state. He adds for each state figures showing the smallest percentage of the population that could elect a majority of the members in each house —a test which "Experts regard * * *

as the best test of the representative quality of legislatures." This shows Connecticut and Vermont at the lowest for House representation, namely, 12% (actually 11.9, as indicated above), with Senate representation of 33% and 47% respectively. There are some smaller percentages of Senate representation, as 7.6% in Nevada. Oregon is said to be the country's most equitably apportioned state, with percentages of 48 for each house. Massachusetts ranks high, with percentages of 45 for each house.

When, however, we turn to the alternative claim of one representative per town we have not made a significant advance. For it has no historical support in this State, and in fact none generally outside the State. Only two other states, Vermont and Rhode Island, have representations by towns; and in both these the system is under attack in pending litigation—indeed in Rhode Island it has been found unconstitutional. Sweeney v. Notte, R.I., 183 A.2d 296, 303. In New York representation in the House is by assembly districts; this is true in our other neighbor, Massachusetts, which, as pointed out in note 3 supra, has a high record for equality of representation. Accepting this alternative system would not change, but would only slightly rearrange, the present malapportionment. Thus Union and Hartford would each have one representative, so that each Union vote would be weighted 423.4 times as heavy as the Hartford vote, instead of 424.5 times as at present. Thus the potential rural veto of all urban proposals would still remain.

We have considered the possibility of building a reasonable plan of House apportionment upon rejecting only a part of the present requirements of the state constitution. But this amounts to so little and would be so disappointing to the reasonable expectations of those who have sought an outright vindication of their rights as hardly to justify the repudiation of the state constitution which it would definitely represent. Thus assume a plan of one representative for each town under 5,000 in population and two representatives for each town of 5,000 or over; this would give a slightly more favorable balance to the cities, but not enough to count materially in any

practical sense. Truly the mountain would have groaned and groaned and brought forth a mouse.[4]

The Pinney intervenors have argued that this is but "a numbers game," and that the arguments for the system lie deeper than statistics such as we have quoted. We will do well to look at these reasons. But we must first put them in the context of this actual case. And here it must be noted that we are dealing not with abstract principles of government, but with the plaintiffs' claims that their constitutional rights have been impaired. Our American way of allowing practically all questions to turn into legal cases has at least the advantage of narrowing the issues and bringing individual rights into sharp focus, however much it may blur the more remote facets of the problem. So even if the rural despotism is a benevolent one, the plaintiffs may nevertheless insist that it deprives them of their rights under the Fourteenth Amendment to the U. S. Constitution. And we are constrained to say that application of the unit principle either in its pure form or in its present Connecticut adaptation results in such great disparities of voter representation in both the House and the Senate as to violate the plaintiffs' constitutional rights.

But since the Pinney intervenors have argued with force and indeed eloquence for the unit principle or principles, we think we should state why we have not found those arguments persuasive even as an abstract proposition of political or governmental science. For stripped of all historical support (which we have found most ambiguous) or support from the supposed "federal analogy" (which we do not find in point) [5] the contention

4. The assumed plan would reduce the House by 33, to 261, making the norm 9,714, instead of 8,623. Seventy-seven towns would have one representative each, while 92 would have 2. The 109 towns having less than 9,000 each and about 16% of the total population would elect a majority of the House. Woodbridge and Southbury, which are slightly over half the norm, would each have the same representation as Hartford, which has a population over 30 times theirs and 16.7 times the norm.

5. The "Connecticut Compromise," advanced by Roger Sherman, of two Senators from each State while the national House of Representatives reflected the distribution of population was of course

comes to this that the towns represent important minority interests or values which should be conserved in one of the Houses. The argument is pressed by all four of the experts whose affidavits have been presented by the Pinney intervenors [6] and is lucidly explained in a book by one of them, deGrazia, Essay on Apportionment and Representative Government, 1963.[7] Against these expressions of view others of most persuasive nature can be adduced,[8] and the many briefs filed in the several cases pending in the Supreme Court, together with the arguments therein, add to the store of at least theoretical reasoning. Of course

that Court may give a precise answer which will be awaited by us all, but it seems more likely that according to custom and practice its views will be given ad hoc in each case adjudicated. Hence we find no ground for delaying our decision to await Supreme Court adjudications; we shall of course remain alert to any suggestions or help to decision which may come from that quarter.

Now there seem to us two major difficulties with the argument as presented. The first is that there seems no coherent minority group or opinion which the 169 towns can be assumed to represent— nothing at all comparable, for example,

not proposed or adopted as a method of apportionment; it was a compromise between nationalism and federalism to obtain approval of a constitution which then hung in doubt. It is thus not a system with any significance for this State today; moreover, the notable delay which affects the Congress, and particularly the Senate, does not suggest practical reasons for its emulation.

6. Professors Alfred deGrazia, Malcolm Charles Moos, André Schenker and Wilfred Ellsworth Binkley.

7. These experts can generate their own warm emotions. Cf. Professor deGrazia's criticism, Essay on Apportionment and Representative Government, 1963, 92, of the argument of his New York University colleague Professor Robert B. McKay in The Federal Analogy, 1962, as "groundless and unworthy of attention" historically; also deGrazia, op. cit. supra at 161, 162, the criticism, as indicating "the kind of combined propaganda, wild wishing, and dubious jurisprudence that has been aroused by Baker v. Carr," of the editorial in the National Civic Review, Oct. 1962, 481, based on an address before a joint session of the National Municipal League and the American Political Science Association by Charles S. Rhyne, past president of the American Bar Association and general counsel of the National Institute of Municipal Law Officers, who was of counsel in the Baker-Carr case. Such disagreements among the experts indicate the seriousness and difficulty of the problem the court is called upon to solve.

8. In view of the wealth of material it is not practical to give more than selected general references. There are good discussions in the several articles appearing

in A Symposium on Baker v. Carr, 72 Yale L.J. 7–106 (1962) ; and the problem is given specific point in Baker v. Carr and Legislative Apportionments: A Problem of Standards, 72 Yale L.J. 968, 992, 1040 (1963), proposing "a substantive standard—equal population as a norm with deviations limited by the requirement of responsiveness to the underrepresented interests within the total governing process." Useful is "Apportionment of State Legislatures": A Report of the Advisory Commission on Intergovernmental Relations, Dec. 1962. See p. 67: " 'Equal protection of the laws' would seem to presume, and considerations of political equity demand, that the apportionment of both houses in the State legislature be based strictly on population"; and pp. 60 and A24 et seq., that the maximum allowable deviation from the State ratio obtained by dividing the total population of the State by the number of representatives in the legislative body should be only 10%. The Commission is a bipartisan continuing body charged by statute with studying and making recommendations in the field of Federal-State-local relations; it is made up of 26 members, including 6 members of Congress, 3 officers of the Executive Branch of the Federal Government, 4 Governors, 4 Mayors, 3 State legislators, 3 elected county officials, and 3 public members. Sixteen members approved the above recommendations, 6 would have preferred the addition to the quoted statement of the words "unless the people directly determine otherwise," 2 filed special concurrences calling for a statement in "less rigid terms"; and this seems to be the intent of 1 other concurrence, leaving only 1 outright dissent.

to labor union members or, indeed, to members of the Republican or Democratic Parties. On such matters as securing local appropriations for highways or schools their interests are quite competitive, and this we fear is likely to be true of most minority problems; there will be 169 objectives, rather than a single one. In fact experience suggests that about the only view upon which a consensus can be expected is the negative one of opposing change. And second, the concept of the duty of a representative to support the minority interest of his town seems a limited and a barren one, adding to the declining importance of legislative bodies in general and state legislatures in particular. The separate interests of the towns should be, and are, vigorously represented by their chief executive officers: the mayor or the first selectman, as the case may be. These can properly press for substantial highway and school appropriations or other favors for the cities or towns they represent.[9] But the legislators should have a broader view; they should represent the people as a whole, and not confine themselves to purely parochial decisions based upon the supposed self-interest of their towns. Indeed, the decline of the two-party system and its significance in American life is often traced to these limited views. Whatever else the Baker-Carr case achieves, it should lead to experimentation in true democracy, with equal or nearly equal representation of the population. This cannot be truly tried if the members of the House represent only Union or Warren or Hartford or Bridgeport, and not the people of the State of Connecticut.

The conclusion to which we must come seems to us clear, namely, that the malapportionment of both the House and the Senate represents a denial of the equal protection of the laws to the plaintiffs; and they are entitled to a declaratory judgment to that effect. We realize that this is hardly more than the beginning of our task and that the more difficult portion of it lies before us as we try to implement this decision. Plaintiffs ask that we adjourn these proceedings for a time to give the Governor the opportunity to call the legislature in special session and to allow that body the opportunity to formulate plans for redistricting which will satisfy constitutional requirements. We accept this suggestion and are adjourning these proceedings for some time, which we shall be glad to extend if or when it appears that the General Assembly is disposed to function. But we are sensible of the long deadlock of many years' duration over the issue, and even the lack of action at the session last spring, when we delayed action in this very case to await the rising of the General Assembly. As Mr. Justice Clark, concurring in Baker v. Carr, 369 U.S. 186, 260, 82 S.Ct. 691, 733, 7 L.Ed.2d 663, well puts it, we do not want to take the position of "blackjacking the Assembly into reapportioning the State." And we are sensible that primaries for the fall elections will soon be coming up and that we should settle the issues as promptly as possible, to allow time for appeal—all before the fall elections. So, while still cherishing the hope of legislative action, we believe we must establish a schedule for ourselves in the event that it is not forthcoming.

At hearings to be held hereafter, we shall therefore expect counsel to propose and to consider appropriate decrees to execute the decision we have here stated. This will involve the development of formulas for the redistricting of both House and Senate along lines we shall now consider to secure a constitutional apportionment in each House. And we shall further discuss with counsel whether the court, acting under F.R.Civ.P. 53, should appoint a master to hold hearings and settle the details of the redistricting following the court's instructions and to re-

9. Under the extensive "Home Rule" enactments of the legislature, there is less occasion than ever for separate, divisive action on the part of the towns. And traditionally under many local decisions education and the public schools are a state, and not a town, obligation.

port to the court with reasonable promptness as to the final decree to be entered.

In fixing the Senate and House formulas to be followed, the court is disposed to rely heavily on the plans suggested in the Report of the Advisory Commission on Intergovernmental Relations, December 1962, on apportionment of State Legislatures, which we have referred to in note 8 supra, applying the allowance of permissible deviation from a state ratio somewhat less rigidly than the Commission recommends. This concession seems reasonable in view of the fact that we do have the division into towns and that these form convenient units for voting and in combination may well provide for appropriate districts to be represented in the General Assembly.

Some experimentation will be needed to see how the existing governmental units may be arranged to achieve the maximum results for comparable units of substantially equal units of population. We suggest here some purely tentative guide lines, subject to revision in later proceedings in this case. It would seem appropriate to have in mind a total membership of the House ranging somewhere from 200 to 300, with the ideal figure as low as is possible to secure a workable series of unit districts. Then it would seem desirable not to divide towns, though the crossing of the ancient county lines would seem appropriate so long as reasonable homogeneity of the units would be achieved. In result the cities would elect several representatives at large, while several small towns would be combined where appropriate to make a single legislative district. On this basis a deviation from the state ratio quite a little in excess of the 10% maximum suggested by the Advisory Commission on Intergovernmental Relations would not seem objectionable. And for the Senate a membership of from 30 to 36 would seem appropriate, with perhaps less deviation from the State ratio here expected than in the House. Here it is apparent, as seemingly all parties agree, that the restrictions stated in Article III, Section 5, of the State Constitution can-

not be accepted as arbitrary limitations on the framing of new Senatorial districts.

In this connection it is to be noted that the Pinney intervenors, while accepting the overriding importance of federal constitutional principles to invalidate the state restrictions on redistricting the Senate, nevertheless assert the still binding force of the State Constitutional provisions, Article III, Section 3, as to the House. We have no hesitation in finding no such differentiation to exist and in concluding that local constitutional, as well as statutory, requirements of legislative apportionment must give way to federal constitutional principles. That, indeed, seems to be the teaching of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663, itself, as well as the cases now following it. At any rate, it is clear that we have jurisdiction, as well as a constitutional duty, to act. Cooper v. Aaron, 358 U.S. 1, 3, 78 S.Ct. 1401, 3 L.Ed.2d 5; American Federation of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873; Sweeney v. Notte, R.I., 183 A.2d 296.

We realize that the course we have outlined involves extensive judicial action as to governmental matters hitherto considered beyond the ken of the judicial branch. But we conceive that this follows with inexorable logic from Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663. The House is grossly malapportioned; the Senate less so, but enough to impair the plaintiffs' constitutional rights. We have decided that we cannot turn our backs on the House situation because of historical or other reasons which seem to us unpersuasive. There are two general courses then open to us with regard to the House. One is to order redistricting anew and from the bottom up, without reference to existing town lines. But the confusion which would result—even the rejection of well known and operable systems of voting in the polls of the town, as well as in the primaries—causes us to reject this method as not so much illegal as overwhelmingly inconvenient. Accepting the

towns as existing voting units and seeking reasonable equality according to population of such units, we must attempt reasonable means to effect reasonable population equality, with the possible deviation indicated above. This will involve, inter alia, some experimentation as to the size of the legislative body. To this we are forced if the legislature does not act hereafter. But we are convinced that, viewed as an experimental approach to reasonableness, results can be achieved which give effect to the principle of equal representation of the people without overviolent dislocation of existing governmental units.

ANDERSON, District Judge (concurring in part and dissenting in part):

I agree with the majority of the court in its conclusion that the composition of the Connecticut State Senate, as now constituted, deprives the plaintiffs of the Equal Protection of the Laws because it violates Article Third, Section 5 of the Constitution of the State of Connecticut. I also agree that the Connecticut State House of Representatives as now apportioned in accordance with Article Third, Section 3 of the Constitution of Connecticut deprives the plaintiffs of the Equal Protection of the Laws because there is included in that Section, after the provision for two representatives for each town of over 5,000, the clause "and every other one shall be entitled to its present representation in the general assembly". This is the so-called "Grandfather-clause" [1] which enables the Town of Union with a population of 383 to have two representatives in the House whereas Madison with a population of 4,567 can have but one, for the sole reason that Union existed as a Town in 1818 and Madison did not. This is no more a ra-

tional or reasonable basis for the difference in numbers of representatives than if a State sought to provide that voters between the ages of 21 and 30 could have one vote and those over 30 could have two.

I disagree, however, with the majority of the court in two respects: First, I cannot concur in their legal conclusion, as a matter of constitutional law, that the bicameral or two-house legislature of a State violates the Equal Protection of the Laws Clause of the Fourteenth Amendment to the United States Constitution unless both of those houses, i. e. the Senate and the House of Representatives, are composed of members, each of whom represents an equal number of the population; and that it is, therefore, unconstitutional for a State to have a Legislature composed of a Senate, thus based on population, and a House of Representatives based on the "unit system", i. e. a fixed number of one or two representatives from each town as a geographical unit. Second, although it is within the power of the court to declare a provision of a State constitution invalid and inoperative because a districting or apportionment, made pursuant thereto, is in conflict with the Federal Constitution, it does not have the power to fill the vacuum thus created by a new provision of its own fashioning and thus, in effect, amend the State's Constitution. The power to make a new provision to fill that vacuum rests in the people of the State of Connecticut and in the people alone. Therefore, I also must disagree with the procedure adopted by the majority for dealing with the question of the relief sought in the case by promulgating so-called "guide-lines", which are really explicit directions for the fashioning of substitutions for the provisions

1. The excision of this clause from the Article Third, Section 3 of the Connecticut Constitution would, in the light of a further provision of that section which requires that a town have at least 2500 inhabitants before it is entitled to have a representative in the Legislature, leave forty-one towns with no representatives at all. It is, therefore, impossible simply to remove portions of Section 3, permitting the remaining portions to remain operative, for it would change the entire sense of the provision made for membership in the House of Representatives in a manner which could well be contrary to the will of the people of the State. It is, therefore, necessary that the entire Section 3 be replaced.

of the Connecticut Constitution herein held invalid, and turning over to an omnicient and presumably politically prophylatic special master, the precise computation of districting formulae for the Senate and House. The court itself has no power to decree the structure and composition of the Legislative Branch of a State, and, a fortiori, it has no authority to delegate or assign the task to an appointee. Where, as here, a new provision of the State's Constitution is needed, every qualified voter in the State of Connecticut should have a full and fair opportunity to vote upon what that provision will be.

Turning to the first basis for disagreement, i. e. the majority's assumption that the Equal Protection of the Laws Clause of the Federal Constitution makes it mandatory that the membership of both Houses of the State Legislature be based on population and nothing else, it should, at the outset, be understood that the purpose of this dissent is *not* to argue the desirability or advantage of having a bicameral legislature with one House based on population and the other on the unit-representation system as a matter of political theory or as a matter of practical application in the State of Connecticut, as opposed to a Legislature both Houses of which are based upon population. It is no part of a federal court's function to tell a State what the structure of its Legislative Branch must be.

The purpose of this dissent is to demonstrate that the people should have a free choice between the two types above described and that they are not, as my learned brothers argue, constitutionally forbidden to have a legislature with one House based upon population and the other upon the unit-representation principle, if that is their choice.

The Supreme Court of the United States has not held that a State must have both Houses of its Legislature based strictly upon population and that a Legislature cannot, because of violation of Equal Protection of the Laws, have one House based on population and the other on the unit system. In fact, in Mac-

Dougall v. Green, 335 U.S. 281, 283–284, 69 S.Ct. 1, 2, 93 L.Ed. 3 (1948), it said:

"To assume that political power is a function exclusively of numbers is to disregard the practicalities of government. Thus, the Constitution protects the interests of the smaller against the greater by giving in the Senate entirely unequal representation to populations. It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution—a practical instrument of government—makes no such demands on the States."

There are cases now pending before the Supreme Court in the decision of which the Supreme Court may discuss such differently composed Houses of a State Legislature, but it would be revolutionary indeed for that Court to hold that it violates the Federal Constitution for a legislature to have one house based on population and the other on the unit system.

Moreover, the Supreme Court has not, even by implication, held houses of a bicameral legislature, so differentiated, to be unconstitutional. The measure of what denies Equal Protection of the Laws is something which amounts to "invidious discrimination".

As Mr. Justice Douglas said in his concurring opinion in Baker v. Carr, 369 U.S. 186, 244, 82 S.Ct. 691, 724, 7 L.Ed. 2d 663 (1962):

"The traditional test under the Equal Protection Clause has been whether a State has made 'an invidious discrimination,' as it does when it selects 'a particular race or nationality for oppressive treat-

ment.' See Skinner v. Oklahoma, 316 U.S. 535, 541 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655]. Universal equality is not the test; there is room for weighting. As we stated in Williamson v. Lee Optical Co., 348 U.S. 483, 489 [75 S.Ct. 461, 465, 99 L.Ed. 563]. 'The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.' "

The majority of this court holds flatly that, even where the Senate of a State Legislature is based strictly upon population, invidious discrimination results if the House of Representatives is based upon the unit principle. This is to say that such a system is "irrational" or is the result of "arbitrary and capricious action".[2] It seems to me that this conclusion is contradicted by the use of the unit system in the Legislative Branch of the Government of the United States, as well as in the Governments of twenty-three of the States and a partial use of of it in six others.[3] It has been considered by leading statesmen and scholars in law and political science as an important and integral part of the system of checks and balances. It represents a traditionally recognized means of placing limitations on power through a proper diffusion of legislative authority. From the Colonial period to the present, the courts and statesmen of both the Executive and Legislative fields have recognized that there are substantial areas of conflicting interests between large urban communities, on the one hand, and the small towns, on the other. The small towns, with a minority of the voting population have, through the unit system, acquired something more than a mere powerless accessibility of represen-

tation and have, through the operation of the unit system, been able to exercise wide power over their own public schools, town highways, police and fire protection, zoning and town planning, recreational facilities, assessments and annual tax rates, and other matters of local governmental concern, which can thus be handled in a manner which is most responsive to the varying needs of the different towns; otherwise, as a minority, they could have and exercise only such local authority as the majority, in the large urban centers, permitted them to have. It is difficult to understand how such a system can be branded as irrational and unreasonable.

The historic and time proven American concept of democracy is not unlimited rule by the majority but is rather a majority rule subject to constitutionally provided checks and balances which provide for minority protection. This is the chief distinguishng characteristic of our form of government. The use of the unit system was a device which evolved out of trial and error over the centuries and was adopted by the founders of the Nation and the States in order that, in effect, the small towns might have a veto power over legislation which might be of disadvantage to them; in other words, it provided a legislative system under which neither the smaller towns nor the larger municipalities would have unlimited power and domination over the other.

The majority has properly explained that the town is the basic unit of government in Connecticut, but goes on to say that ultimate control, however, remains with the Legislature as if the position of the town, as the basic unit of government, only exists by sufferance

2. The opinion of the Court in Baker v. Carr, 369 U.S. 186, 226, 82 S.Ct. 691, 715, 7 L.Ed.2d 663 (1963), says that what violates the Fourteenth Amendment is "that a discrimination reflects *no* policy, but simply arbitrary and capricious action."

3. The following States use a unit system in one house of a bicameral legislature:

Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, Georgia, Florida, Hawaii, Idaho, Illinois, Iowa, Maryland, Michigan, Mississippi, Montana, Nevada, New Jersey, New Mexico, Rhode Island, South Carolina, Texas and Vermont.

The following States have significant unit limitation in a population standard: California, Maine, New York, North Dakota, Ohio and Pennsylvania.

and that the Legislature might abolish this state of affairs at any time it chose. Of course, this is theoretically so, but practically it is not, because the unit system, whereby the less populous areas have the controlling voice in the House of Representatives, assures the towns, through their representatives, that their power to manage their local affairs will be preserved. The majority takes the position that no consideration at all need be given to the urban versus small town conflicts in interest because there is no such thing. However, MacDougall v. Green, supra, and Baker v. Carr, supra, as well as nearly all of its lower court progeny, give recognition to the existence of such a disparity of interests.[4]

The majority opinion says there is no justification to be found in the "Federal Analogy" for the use of the unit system for the membership of one house of a State Legislature, even though the other house is based upon population, because it is not in point. It seeks to distinguish the use of the unit system in the Legislative Branch of the Federal Government from that in the State governments by arguing first, that the Federal Government is made up of Sovereign States, but that the States are not composed of sovereign towns; and second, that the analogy has a shaky foundation because the system was adopted for the Legislative Branch of the Federal Government as a result of a compromise. Granting that these two interesting facts are true, they seem to me altogether irrelevant on the issue of whether this device of using the unit system in one of the houses of a bicameral legislature is irrational and unreasonable. Nearly all constitutional and statutory enactments are the result of compromise and are not, because of that, to be given no weight. Moreover, there is no magic in the word "sovereign" as attached to a State, as opposed to "the rights and powers of the towns of Connecticut".[5] These phrases are simply comparative descriptions of bundles of governmental power and, it seems to me, the use of the unit representation device is just as rational and reasonable whether it is applied to a large package of governmental powers or to a small one. The definition of unequal protection of the laws as "invidious discrimination" carries with it a moral implica-

4. The great majority of federal courts since Baker v. Carr, supra, when confronted with a unit system of representation based either on area or political subdivisions in one house of a bicameral legislature with the other house based on population, have indicated that such a unit sytem so used meets the requirements of the Fourteenth Amendment to the United States Constitution. Lisco v. Love, 219 F.Supp. 922 (Colo.1963); Germano v. Kerner, 220 F.Supp. 230 (Ill.1963); Sobel v. Adams, 208 F.Supp. 316, 322 (Fla.1962); Sobel v. Adams, 214 F.Supp. 811 (Fla.1963); Nolan v. Rhodes, 218 F.Supp. 953 (Ohio 1963); W. M. C. A. v. Simon, 208 F.Supp. 368 (N.Y.1962); Toombs v. Forston, 205 F. Supp. 248, 257 (Ga.1962); Maryland Committee for Fair Representation v. Tawes, 228 Md. 412, 180 A.2d 656 (1962); Jackman v. Bodine, 78 N.J.Super. 414, 188 A.2d 642 (1963); Sweeney v. Notte, 183 A.2d 296, 301 (R.I.1962). Contra, Sincock v. Duffy, 215 F.Supp. 169 (Del. 1963); Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350 (1962).

5. The report of the Advisory Commission on Intergovernmental Relations relied on by the majority as authority for the inapplicability of the federal analogy due to the historical accident of the unit system in the United States Senate, itself admits that in the New England States there is a historical basis for the position that the State is a federation of units of local government. Apportionment of State Legislatures, p. 43 (1962). The history of Connecticut as a colony shows that both the structure of the government and the prevailing political and moral philosophy of the times treated the town or community as the center of power. The historical basis for a unit system based on representation by towns is clear. See, e. g., Andrews, The Colonial Period of American History, pp. 91, 92, 103–7, 112, 117, 165 (1936); Andrews, The River Towns of Connecticut (1889); Osterweis, Three Centuries of New Haven, p. 50 (1953); Clark, A History of Connecticut (1914); Calder, New Haven Colony (1934); Loomis & Calhoun, Judicial and Civil History of Connecticut (1895).

tion and reference to recognized standards of what is right and wrong, fair and just. The use of the unit system in State Legislatures whereby a fixed number of one or two representatives was provided for each of the towns, as geographical units, was adopted for the very same reason and for the very same purpose for which each State in the Federal Union was given two senators, and that is, to effect a diffusion of legislative power so that a check would be placed upon legislative control by sheer numbers of the population without going to the other extreme by giving complete legislative control to a minority.

If the use of the unit system causes invidious discrimination in the State legislative system because a small town has the same number of representatives as another town with many times its population, then it must logically follow that it is invidious discrimination for the State of Alaska, with a population of only 226,167, to have two senators in the Federal Congress, while the State of New York, having a population of 16,782,304, also has but two United States Senators. The fact that the Fourteenth Amendment cannot invalidate Alaska's right to two United States Senators does not, ipso facto, make reasonable Alaska's right to two United States Senators while at the same time it makes a State's use of the same unit system unreasonable. What is rational and reasonable for the Federal Government ought not to be condemned as irrational and unreasonable for a State. Over half of the States of the United States, in one house or the other of their legislatures, have to a greater or less extent, used the unit representation principle. It may also be noted that a number of new states, admitted to the Union since the ratification of the Fourteenth Amend-

ment to the Federal Constitution, adopted the use of the unit system in their legislative branches and were accepted into the Union by Congress, which found them qualified for admission under the Guaranty Clause, Article Four, Section 4 of the Federal Constitution. From the adoption of the Fourteenth Amendment to the present, both Congress and the President, as head of the Executive Branch of the Government, in determining whether or not a new State has qualified under the Guaranty Clause, have passed upon the constitutionality of a new State's form of government. The two most recently admitted States, Hawaii and Alaska, have both adopted the unit representation system for one of the houses of their Legislatures, while the other houses are based upon population. It apparently was the opinion of the Legislative and Executive Branches of the Government of the United States that such use of the unit system was not irrational or unreasonable, or arbitrary or capricious, and that it created no invidious discrimination in violation of the Equal Protection of the Laws of the Federal Constitution.[6]

The admission of these new States under the Guaranty Clause is not referred to pursuant to any claim that the Guaranty Clause itself is "a repository of judicially manageable standards which a court could utilize independently in order to identify a State's lawful government," Baker v. Carr, supra, 369 U.S. p. 223, 82 S.Ct. p. 713, but simply to point out that the responsible incumbents of the Executive and Legislative Branches of the Federal Government, to whom, we trust, we may attribute some expertise, were of the opinion that the use of the unit system in one of the houses of the Legislatures of Alaska and Hawaii was rational and reasonable and not invidiously dis-

6. The Congress and Executive Department of the United States have consistently demanded that the governments of States which are to be admitted or readmitted to the Union conform to the requirements of the United States Constitution—See, e. g., Report of the Joint Committee on Reconstruction, 39th Cong., 1st Sess., p. xx (1866) ; An Act to Provide for the More Efficient Government of the Rebel States, § 5, 14 Stat. 429 (1867) ; Public Law 85–508, An Act to Provide for the Admission of the State of Alaska into the Union, 72 Stat. 339 (1958) and Proclamation No. 3269, 24 Fed.Reg. 81 (1959).

criminatory against any voter in those States.

The majority assumes that the phrase "one person—one vote" and the decision of the Supreme Court in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), hold invalid the use of the unit representation system in one of the houses of a State legislature, because the voter in a small town in voting for his representative in the House under the unit system has greater weight than that of a voter in a larger town. It seems to me that the majority gives a mistaken meaning to the phrase and misinterprets the holding of the case. In fact, the very portion of the opinion in the Gray case which the majority quotes makes this clear. The phrase "one person—one vote" simply means that an elector in voting for a candidate for office in a town-wide, district-wide, county-wide or state-wide election is entitled to have his vote within that political subdivision count as a whole, undiluted vote, equal to the vote of any other elector who has the right to vote for that candidate within the same subdivision. In the Court's opinion in Gray v. Sanders, supra, 372 U.S. at p. 379, 83 S.Ct. at p. 808, the Court said:

> "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote * * *."

and at page 382 of 372 U.S., at page 809 of 83 S.Ct. Mr. Justice Stewart said:

> "Within a given constituency, there can be room for but a single constitutional rule—one voter, one vote."

In effect, Gray v. Sanders simply held that in an election for governor of a State, where obviously the whole State is the geographical unit, a voter from one part of the State is not entitled to have his vote for governor weighted more heavily than that of another voter who happens to come from a different part of the State. Although the majority of this court leans heavily upon Gray v. Sanders, supra, to support its position, the case does not stand for the proposition that the voter

in a rural town cannot, through the use of the unit representation system, be one of a lesser number of electors empowered to send a representative to the Legislature where, in the same election, another voter of another and more populous town is one of a larger number of electors authorized to send a representative to the same legislative house. It is apparent that the decision in Gray v. Sanders, supra, would have been exactly the same if a voter in the City of Atlanta had had his vote weighted more heavily than that of a voter in some small Georgia town. The majority opinion of the Supreme Court specifically said:

> "This case, unlike Baker v. Carr, supra, does not involve a question of the degree to which the Equal Protection Clause of the Fourteenth Amendment limits the authority of a State Legislature in designing the geographical districts from which representatives are chosen either for the State Legislature or for the Federal House of Representatives. Nor does it include the related problems of Gomillion v. Lightfoot, 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110], where 'gerrymandering' was used to exclude a minority group from participation in municipal affairs. Nor does it present the question, inherent in the bicameral form of our Federal Government, whether a State may have one house chosen without regard to population." 372 U.S. at 376, 83 S.Ct. at 806.

The majority opinion cites the case of Sweeney v. Notte, 183 A.2d 296 (R.I.1962), as one of the principal authorities upon which it relies in its position that one house of a legislature cannot be based upon the unit principle of representation, even though the other house is based strictly upon population, without violating the Fourteenth Amendment to the Federal Constitution. Notte, however, furnishes little if any support for the majority's conclusion. In the Notte case the apportionment of the Senate was not in issue. In fact, the Senate was apportioned primarily on the town

780

unit principle.[7] The issue in the case concerned the apportionment of the House of Representatives, which was mainly based upon population but subject to two limitations, i. e. that the maximum number of representatives be 100 and that each town would have at least one representative. In the light of the total composition of the Legislative Branch, it is not surprising that the two limitations on the principle of apportionment by population for the House of Representatives were held to violate the Fourteenth Amendment to the United States Constitution. All the Rhode Island Supreme Court did in Notte was to remove certain limitations which kept the House of Representatives from being based strictly on the population principle. The result of the court's decision is that Rhode Island has a Senate based principally on the unit system and a House of Representatives based upon population.

For these reasons the voters of Connecticut should not be held to be forbidden, as a matter of constitutional law, to adopt, if they choose to do so, the unit system of representation for one of the Houses of its bicameral legislature, provided the membership of the other House is based upon population.

It must be reemphasized that the foregoing discussion is not intended to advocate or be construed to advocate the adoption of such a unit system by the State of Connecticut. It is not the business of the Federal Court to say what legislative system the people of Connecticut should have so long as its provisions do not violate the Federal Constitution. The people may not only establish a Legislative Branch in which the membership of both Houses is based upon population

alone, but they may also, without Federal Constitutional infringement, establish a Legislature which incorporates the use of the unit representation system in one house where the other is based upon population.

The second reason for my disagreement with the majority opinion is that the court goes beyond its power and proper domain when, after acting within its jurisdiction by declaring a portion of the Constitution of the State of Connecticut invalid, it assumes the authority to pass upon and decree new State constitutional provisions without giving the people of the State a full and fair opportunity to vote upon them.

Baker v. Carr, supra, implies that the Federal Courts can declare unconstitutional a State statute, or a State constitutional provision, the enforcement of which deprives a voter of Equal Protection of the Laws. It also implies that a Federal Court may order a State Legislature or State officials to comply with provisions of the *State's own Constitution* where their failure to do so has resulted in deprivation of a voter's rights under the Fourteenth Amendment of the Federal Constitution, because here the people of the State have expressed their will in the State's Constitution, and the decree of the Federal Court does not contravene the sovereignty of the State or do damage to the division of powers between the Federal Government and the States. The Federal Court is doing no more than correct the intransigence or bad faith of State legislators or officials whose misconduct is depriving a voter of his Fourteenth Amendment rights. This, however, is quite a different matter from following up a judgment which invalidates a portion of a State Constitu-

7. Each town in Rhode Island has one senator, and towns with over 25,000 electors have an additional senator for each additional 25,000 electors, Rhode Island Constitution, Amendment XIX. Out of a total of forty-six senators Providence has five, Pawtucket two, Cranston two, and Warwick two. General Laws of Rhode Island, Sections 22–1–2 through

22–1–6 (1956). The other 35 towns in Rhode Island each have one senator. Disparities in the ratio of senators per population are great; Providence has one senator per 41,499 and Pawtucket one per 40,500, while Kingston has one senator per 2,616 and Wickford one per 2,934.

tion as in conflict with the Federal Constitution with an order for State officials to substitute, for the unconstitutional portion, a new provision manufactured under the aegis of the Federal Court.

While the majority opinion uses diplomatic language in speaking of not treating "the state organs of government as adversaries to be given harsh mandates," and of looking for cooperation from its officers, and, while it disclaims any desire to "blackjack the Assembly into reapportioning the State", a careful analysis of the opinion makes it abundantly clear that the court is ordering redistricting of the Senate and a combination of reapportioning and districting of the House of Representatives into substantially equal units of population. There is to be no substantial deviation from the principle laid down, that the membership of both Houses of the Legislature must be based strictly upon population and that the only variances that will be tolerated are such as may result from the impossibility of achieving exact numerical equality in voting districts made up of some of the smaller towns and subdivisions of larger towns, as well as such changes as may come from shifts in population between the years of the National census. The majority holding says "[t]hat the Senate must be redistricted promptly in such a way as to achieve substantially equal weighting of the votes of all voters * * * in accordance with the guidelines * * *" and "That the House must be reapportioned promptly in such a way as to achieve substantially equal weighting of the votes of all voters—in accordance with the guidelines * * *." In the preamble it refers to the late Judge CLARK'S opinon "to indicate the guidelines which this Court intends to follow in formulating its decree." In Judge CLARK'S opinion he laid down the guidelines and spoke of experimentation in cooperation with the parties and State officials in implementing them. Judge CLARK expressed the hope for legislative action but said, "we must establish a schedule for ourselves in the event that it is not forthcoming", and again, "To this we are forced if the legislature does not act hereafter." The guidelines show no differentiation between the legislative action sought in connection with the Senate, which may or may not involve changes in the Connecticut Constitution, and in the House, where the court holds all of Article Third, Section 3 of the Connecticut Constitution invalid.

If the guidelines of the court can be carried out simply by the passage of a statute which complies with the provisions of Article Third, Section 5 of the Connecticut Constitution, the Connecticut Legislature will be able to act within its power; but if it appears that it will be impossible to comply with strictures of Section 5 on the creation of senatorial districts so that they cannot be made equal in population (which is almost certainly the case) then an amendment to Section 5, Article Third of the Connecticut Constitution will have to be made. The majority of the court demands that the Legislature enact into law the guidelines which it lays down, but the Legislature by itself is powerless to amend the Connecticut Constitution. The majority concedes that it is unlikely that the Legislature will do anything, and it is obviously impossible for the Legislature to attempt to effect any amendment to the State Constitution, as the Constitution now stands, in time for this year's election, even if the Legislature were disposed to do so. The majority of the court has made it abundantly clear that in the face of this situation it will decree its own new districting and apportionment of the Connecticut Legislature. This is the chief target and crux of my disagreement with the action called for by the majority opinion, and that is, that a Federal Court has no power affirmatively to order a State to amend its Constitution in conformity with standards or guidelines laid down by the court, not to mention its lack of power to impose such amendments upon the State by fiat.

The determination of the proper boundaries of the power of the Federal Courts in granting relief in a case such

as this is difficult in the extreme. It is clear, to start with, that the court has power to declare a State constitutional provision, statute or executive order unconstitutional because it violates the Fourteenth Amendment to the Federal Constitution. On the other end of the range, it is also perfectly clear that the Federal Courts cannot draft constitutional provisions and impose them on the States in place of the State constitutional provisions which the court has just declared invalid. The question is how far can the court go from one end of this range to the other, not only in enjoining a State's infringement of a voter's right to equal protection of the laws but to give that voter affirmative assurance that he will be able to vote and enjoy that protection as well. Of all of the cases that have arisen in various States of the Union, since the decision in Baker v. Carr, supra, none has gone as far as the majority of the Court, in the present case, in its assumption of the power to decree the substance of State constitutional changes, which the majority makes perfectly clear it will impose upon the State of Connecticut unless the Legislature does so—a prospect which it concedes to be practically hopeless. The cases which most nearly approach the majority position are Moss v. Burkhart, 220 F.Supp. 149 (W.D.Oklahoma 1963) and possibly Davis v. Synhorst, 217 F. Supp. 492 (Iowa 1963).[3] In Moss v. Burkhart, supra, the court was faced with a recalcitrant and rebellious Legis-

lature which refused to comply with the court's order to discontinue infringing the Fourteenth Amendment rights of the petitioner and also, affirmatively, to enact statutes to comply with *Oklahoma's own* constitutional provision for equal districting of both Houses based upon population. When the Legislature failed and refused, the court promulgated an "order of reapportionment" of its own. This resulted in a system, not in conflict with the Federal Constitution, and one which complied with the will of the people of Oklahoma as expressed in the State's *own Constitution.* Even so, the court had serious misgivings about its exercise of power. "We know that the judicial power to grant redress for deprivation of a civil right is usually a negative power, effected by conventional injunctive decree. It may well be that the affirmative relief we grant is in excess of our judicial power. If so, we will know in due time * * *." Moss v. Burkhart, supra, 220 F.Supp. at page 155.[9] But this is not the case before us. It may well be doubtful whether any Federal Court has the power to draft reapportionment statutes or laws and to order the State to obey them, even when the statutes which the court has drafted are in fulfillment and compliance with the State's own, already existing constitutional provisions. In view of the almost certain impossibility of redistricting the Connecticut Senate without constitutional amendment, it is not necessary for this court to pass upon the question presented

8. In Davis v. Synhorst, 217 F.Supp. 492 (Iowa 1963), the court, after invalidating portions of the Iowa Constitution, withheld affirmative relief to allow the Iowa Legislature to correct the defects found in the Iowa apportionment system. The Legislature apparently did not act in accordance with the court's suggestion. The court ordered the Legislature into special session to adopt an *interim* reapportionment for the coming elections and threatened that the court itself would adopt an *interim* reapportionment if the Legislature again failed to act. Although no official report of this latest order is now available, the proceedings are

reported in New York Times, January 16, 1964, p. 21, col. 7.

9. In Sobel v. Adams, 208 F.Supp. 316 (Fla.1962), the court was faced with a situation similar to that in Connecticut. In rejecting a plan where small counties, analogous to the small towns of Connecticut, would be consolidated into districts for purposes of voting, the court was mindful of the limitations of its power: "The consolidation of many of the smaller and less populous counties with a contiguous one has been suggested. Desirable as this might be, it is not a cure for malapportionment which we are authorized to administer". 208 F.Supp. at 322.

in Moss v. Burkhart, supra. The issue here is whether a Federal Court has the power to draft and, in effect, enact State constitutional provisions, which the people have had no opportunity to accept or reject. Thus far no court has imposed or threatened to impose, by judicial decree, a new constitutional provision upon a State.

The Federal Court probably has no power to draft statutes under these circumstances and order the State to obey them. Certainly the court has no power to draft, and require the people of a State to accept, an amendment to the State Constitution. It is my opinion that in this case the Federal Court has no power to go beyond ordering the Legislature of Connecticut to adopt measures, under the authority of its own Constitution, to present to the people of the State the question of how the membership of its Senate and House of Representatives is to be constituted and to give the people a full and fair opportunity to vote upon that question.

The court cannot go beyond opening the door to the affirmative relief which the plaintiffs want and which can be supplied only by the people of the State by their enacting, in place of the present Article Third, Section 3 and Section 5

(if the Senate cannot be redistricted under the present Section 5), new constitutional provisions which will not be in conflict with the Fourteenth Amendment to the Federal Constitution.[10]

As the Connecticut Constitution is now written, however, there are grave difficulties involved in the amendment procedure. To explain this more fully it is necessary to discuss two provisions of the Connecticut Constitution. One is Article 1 of the Amendments [11] and the other is Section 2 of Article First.[12]

It has been stated in this opinion that the use of the unit principle of representation in choosing the members of the House of Representatives in Connecticut does not violate the Fourteenth Amendment to the Constitution of the United States, as long as the Senate is based upon population, and that the use of the unit system is a rational device to provide for the diffusion of legislative power which will give the smaller towns the potential electoral power to compel a reasonable response to their needs and interests, within a system where the urban centers have a similar and balancing power. In view of this, the method of amending the Constitution of Connecticut as set forth in its First Amendment, on its face, can work only to dis-

10. The vote of the people either adopting or rejecting an apportionment system may have a bearing on the rationality of that system when tested under the Fourteenth Amendment to the United States Constitution. See, e. g., Davis v. Synhorst, 217 F.Supp. 492, 505 (Iowa 1963); Lisco v. Love, 219 F.Supp. 922 (Colo. 1963). This is another way of saying that government should be by consent of the governed.

11. Article 1 of Amendments, Constitution of Connecticut, Sec. 1: "Whenever a majority of the house of representatives shall deem it necessary to alter or amend this constitution, they may propose such alterations and amendments, which proposed amendments shall be continued to the next general assembly and be published with the laws which may have been passed at the same session; and if two-thirds of each house, at the next session of said assembly, shall approve the amendments proposed, by yeas

and nays, said amendments shall, by the secretary, be transmitted to the town clerk in each town in this state, whose duty it shall be to present the same to the inhabitants thereof, for their consideration, at a town meeting, legally warned and held for that purpose; and if it shall appear, in a manner to be provided by law, that a majority of the electors present and voting on such amendments at such meetings shall have approved such amendments, the same shall be valid, to all intents and purposes, as a part of this constitution."

12. Constitution of Connecticut, Article First, Sec. 2: "That all political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit; and that they have at all times an undeniable and indefeasible right to alter their form of government in such manner as they may think expedient."

criminate invidiously against voters in the position of the plaintiffs, because the first amendment limits the power to *initiate* amendments to the State Constitution to the House of Representatives. As that House is so constituted that the controlling voice in it is that of the small towns, the consequence is that the key to amending the Connecticut Constitution rests exclusively in the hands of the small towns; and the large urban centers, whose electoral power is exercised in the Senate, have no means by which they can initiate a change in the State's Constitution.[13] Historically, when the Senate was first created, reasons existed for placing this power in the more numerous House, but at the present time to provide that small towns can initiate amendments but urban centers cannot, is neither rational nor reasonable and is plainly capricious and arbitrary. I would, therefore, hold that the First Amendment of the State Constitution is in violation of the Fourteenth Amendment to the Federal Constitution and cannot be used by the Legislature as a means of initiating necessary amendments to take the place of Article Third, Section 3 and also Section 5, if necessary.

There remains Section 2 of Article First under the provisions of which, the Legislature may submit to the qualified voters of the State of Connecticut proposed amendments to the State Constitution to replace Article Third, Section 3, Section 5 if necessary, and the First Amendment, which are in violation of the Federal Constitution.[14]

It is suggested that each of the proposed amendments to Article Third be submitted to the voters in two or more alternatives.

This court should reserve jurisdiction to see whether or not within a reasonable time constitutional amendments, implemented by any necessary statutes, are enacted which do not deprive voters of their Fourteenth Amendment rights under the Federal Constitution. If the legislators or other State officials refuse to enact or prevent the enactment of such provisions, this court will be faced with the uncomfortable question of what sanctions, if any, should be imposed. A complete refusal by an illegally constituted Legislature to take the necessary action might conceivably result in the State of Connecticut having no Legislative Branch in its government. The question will then arise as to whether or not Connecticut has a republican form of government within the meaning of the Guaranty Clause of the Federal Constitution. Relief under these circumstances rests in the hands of the Congress of the United States. Baker v. Carr, supra.

Without further delay the Governor should be directed to call a Special Session of the General Assembly of the State of Connecticut to take the necessary steps to place before the voters of the State proposals to amend the First Amendment and Article Third, Section 3 of the State Constitution, as well as to redistrict the present Senate to conform to Article Third, Section 5 or, if this is

13. The right to amend or change the form of government is a vitally important right. Justice Clark, concurring in Baker v. Carr, 369 U.S. at 258, 82 S.Ct. at 732, said: " * * * I would not consider intervention by this Court into so delicate a field if there were any other relief available to the people of Tennessee. But the majority of the people of Tennessee have no 'practical opportunities for exerting their political weight at the polls' to correct the existing 'invidious discrimination.' Tennessee has no initiative and referendum. I have searched diligently for other 'practical opportunities' present under the law. I find none other than

through the federal courts. The majority of the voters have been caught up in a legislative strait jacket." Lower courts have considered the availability of this right in passing upon a State's apportionment system. See, c. g., Nolan v. Rhodes, 218 F.Supp. 953, 956 (Ohio 1963) ; Davis v. Synhorst, 217 F.Supp. 492, 499 (Iowa 1963).

14. See Sincock v. Duffy, 215 F.Supp. 169, 192 (Del.1963) ; Wells v. Bain, 75 Pa. 39 (1874). Every State reserves to the people the power to change their form of government. Advisory Commission on State Legislatures, Apportionent of State Legislatures, p. 57 (1962).

impossible, to take the necessary steps to place before the voters a proposal to amend Article Third, Section 5, so that all of these portions of the Connecticut Constitution, amended by vote of the people of the State, will no longer be in conflict with the Fourteenth Amendment of the Constitution of the United States.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, after full hearing, makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. The plaintiffs are all residents and qualified voters in the State of Connecticut, and more particularly are residents and qualified voters in the following Towns and Senatorial Districts:

(a) Oliver Butterworth, Miriam Butterworth and S. Rains Wallace, in the Town of West Hartford, in the Fifth Senatorial District;

(b) Robert Beach and Charles Jacobson, in the Town of Manchester, in the Fourth Senatorial District;

(c) George Lucas, in the Town of East Hartford, in the Fourth Senatorial District;

(d) Bradley Morehouse and John Norman, in the Town of Fairfield, in the Twenty-fifth Senatorial District;

(e) David S. Maclay, in the City of Bridgeport, in the Twenty-first Senatorial District; and

(f) Albert B. Holland, in the City of Hartford, in the Second Senatorial District.

2. The Pinney intervenors are all residents and qualified voters in the State of Connecticut, and more particularly are residents and qualified voters in the following Towns and Senatorial Districts:

(a) A. Searle Pinney, in the Town of Brookfield, in the Twenty-fourth Senatorial District;

(b) J. Tyler Patterson, Jr., in the Town of Old Lyme, in the Twentieth Senatorial District;

(c) Frederick Pope, Jr., in the Town of Fairfield, in the Twenty-fifth Senatorial District;

(d) Peter P. Mariani, in the Town of Groton, in the Eighteenth Senatorial District.

Two of the Pinney intervenors are residents and qualified voters in towns of less than 5,000 population: A. Searle Pinney of Brookfield (pop. 3,405) and J. Tyler Patterson, Jr. of Old Lyme (pop. 3,068).

3. The intervenor John M. Bailey is a resident and qualified voter in the State of Connecticut, and more particularly is a resident and qualified voter in the Town of Hartford, in the Second Senatorial District.

4. The defendants are elected officials of the State of Connecticut, as follows:

(a) John Dempsey is the Governor of the State of Connecticut;

(b) Ella T. Grasso is the Secretary of the State of Connecticut;

(c) Donald J. Irwin is Treasurer of the State of Connecticut;

(d) Raymond S. Thatcher is Comptroller of the State of Connecticut;

(e) As Secretary of the State of Connecticut, Ella T. Grasso is also designated Commissioner of Elections, Section 9–3, General Statutes of Connecticut, Revision of 1958, and is, under Connecticut law, charged with supervisory and other duties relating to the conduct of elections.

5. In each of the Towns of Connecticut (169 in number), a number of persons are charged, under Connecticut law, with various duties relating to the conduct of elections. The total number of such persons are too numerous to make it practicable to bring them all before the Court.

6. The complaint in this action seeks to restrain the enforcement, operation or execution of portions of the Constitution and certain statutes of the State of Connecticut by restraining the action of the defendants upon the ground that the Connecticut Constitution and such statutes contravene the Constitution of the United States.

7. The Court takes judicial notice that Connecticut is a small, compact State, the dimensions of which are approximately 89 miles by 54 miles. No part of the State is more than two hours distant by automobile from the City of Hartford, the capital of the State, and no part of the State is more than four hours distant from any other part of the State.

8. The population of the State of Connecticut in 1960 was 2,535,234 and in 1820 was 275,248.

9. The Constitution of the State of Connecticut, presently in effect, was adopted in 1818 and, from time to time since then, has been amended.

10. The Connecticut Constitution establishes a bicameral General Assembly.

11. The provision of the Connecticut Constitution relating to the Senate of the State of Connecticut is as follows:

"Article III, Section 5.

"The number of senatorial districts shall not be less than twenty-four nor more than thirty-six, and each district shall elect only one senator. The districts shall always be composed of contiguous territory, and in forming them regard shall be had to population in the several districts, that the same may be as nearly equal as possible under the limitations of this section. Neither the whole or a part of one county shall be joined to the whole or a part of another county to form a district, and no town shall be divided, unless for the purpose of forming more than one district wholly within such town, and each county shall have at least one senator. The districts, as now established by law, shall continue the same until the session of the general assembly next after the completion of the next census of the United States, which general assembly shall have power to alter the same, if found necessary to preserve a proper equality of population in each district, but only in accordance with the principles above recited; after which said districts shall not be altered, nor the number of senators altered, except at a session of the general assembly next after the completion of a census of the United States, and then only in accordance with the principles hereinbefore provided. The persons voted for for senators shall, at the time of such vote, belong to and reside in the respective districts in which they are so voted for."

12. Article Third, Section 5, was adopted in 1901.

13. The last general redistricting of the Senate took place in 1903, at which time the General Assembly divided the State into thirty-five districts. A thirty-sixth district (Greenwich) was added in 1941. Aside from the addition of this district and some shifting of boundaries between the districts in New Haven, there has been no valid redistricting of the Senate since 1903.

14. Legislation enacted in 1953 to redistrict the Senate was invalidated by the Connecticut Supreme Court of Errors upon the ground that only the session of the General Assembly next after completion of the United States census has the power to redistrict the Senate.

15. All other attempts to redistrict the Senate have failed.

16. As presently constituted, the Senatorial Districts and the population of each such district are as stated in paragraph 2c of the Stipulation in this case dated March 8, 1963.

17. The disparity between the most populous Senatorial District (the Twenty-fifth with 175,940 inhabitants) and least populous District (the Tenth with 21,627 inhabitants) is in a ratio of 8 to 1.

18. If the total population of the State of Connecticut is divided by the number of Senators in the Senate of the State of Connecticut, the norm for each Senatorial District is 70,423. The average population of the five most populous districts is 159,721, or 226.8% of the norm. The average population of the

five least populous districts is 28,722 or 40.8% of the norm.

19. The population of the five most populous Senatorial Districts represents 31.5% of the total population of the State and elects five Senators (13.9% of the total number of Senators). The population of the five least populous Senatorial Districts represents 5.6% of the total population of the State and also elects five Senators.

20. The Senatorial Districts having a total population of 811,242, or 31.9% of the total population of the State, elect 19 Senators, a majority of the Senate.

21. Seventeen of the 36 Senatorial Districts have populations 25% or more below the norm. Those 17 Districts have a total population of 699,249, or 27.6% of the total population of the State, and elect 47.2% of the Senate.

22. Eight of the 36 Senatorial Districts have populations 25% or more above the norm. Those 8 Districts have a total population of 1,112,620, or 43.9% of the total population of the State, and elect 22.2% of the Senate.

23. By reason of the limitations set forth in Article Third, Section 5, of the Connecticut Constitution, the Senate cannot be redistricted in conformity with that Article in such manner as to avoid disparities between the most populous and least populous Districts which are on the order of two to one.

24. The provision of the Constitution of the State of Connecticut establishing representation in the House of Representatives is as follows:

"Article III, Section 3.

"The house of representatives shall consist of electors residing in towns from which they are elected. Every town which now contains, or hereafter shall contain a population of five thousand, shall be entitled to send two representatives, and every other one shall be entitled to its present representation in the general assembly. The population of each town shall be determined by the enu-meration made under the authority of the census of the United States, next before the election of representatives is held. In case a new town shall hereafter be incorporated, such new town shall not be entitled to a representative in the general assembly unless it has at least twenty-five hundred inhabitants, and unless the town from which the major portion of its territory is taken, has also at least twenty-five hundred inhabitants, but until such towns shall each have at least twenty-five hundred inhabitants such new town shall for the purpose of representation in the general assembly be attached to and be deemed to be a part of the town from which the major portion of its territory is taken, and it shall be an election district of such town for the purpose of representation in the house of representatives."

25. The Fundamental Orders of 1638-9 provided that the three original towns of Hartford, Windsor and Wethersfield were to send "four of their Freemen" as their deputies to every General Court, and new towns were to send "so many deputies as the Court shall judge meet, a reasonable proportion to the number of Freemen that are in the said towns."

26. The Charter of 1662, granted by Charles II, provided that the General Assembly should have not more than two persons from each town.

27. The Constitution adopted in 1818 provided that in the House existing towns should have the same number of representatives "as at present practised and allowed." New towns, formed after the adption of the Constitution, should have one.

28. By constitutional amendment in 1874, every town having more than 5,000 persons was allotted two representatives.

29. By constitutional amendment in 1876, the requirement was added that new towns must have a population of at least 2500 before becoming entitled to one representative.

30. All attempts to reapportion the Connecticut House of Representatives have failed.

31. The present number of representatives is 294. In 1959 it was 279. In 1903 it was 255. In 1821 it was 203.

32. The population of the Towns in the State of Connecticut in the years stated, and the number of representatives of each Town in the Connecticut House of Representatives in the year stated, are as enumerated in paragraph 2b of the Stipulation in this case dated March 8, 1963.

33. The population of the ten most populous Towns and Cities of the State is 988,818, or 39% of the population of the State, and they elect twenty representatives, or 6.8% of the total number of representatives.

34. The population of the ten least populous Towns is 7,554, or 0.2% of the total population of the State, and they elect twelve representatives, or 4.0% of the total number of representatives.

35. Towns having a total population of 301,485, or 11.9% of the total population of the State, elect 148 representatives, a majority of the House of Representatives of the State.

36. If the total population of the State is divided by the number of representatives in the House of Representatives of the State, the result is 8,623 persons per representative ("the norm").

37. The average population of the ten most populous Towns and Cities in the State of Connecticut is 98,882, and each such Town or City is entitled to two representatives. The representatives of such Town and Cities represent, on the average, 49,441 persons, or 573.4% of the norm.

38. The average population of the ten least populous Towns in the State of Connecticut is 755, and each such Town is entitled, on the average, to 1.2 representatives each. The representatives of such Towns represent, on the average, 629 persons or 7.3% of the norm.

39. A representative from the City of Hartford represents, on the average, 81,-089 persons. A representative from the Town of Union represents, on the average, 191 persons. The vote of a resident and voter of Union is weighted 424.5 times as heavily as the vote of a resident and voter of Hartford.

40. One hundred nineteen of the 169 Towns in the State of Connecticut have populations per representative 25% or more below the norm, and 27 have populations per representative 25% or more above the norm. The Towns below the norm have a total population of 518,647, or 20.4% of the total population of the State, and elect 194 representatives, or 66.0% of the House. The 27 Towns in the State with a population per representative 25% or more above the norm have a total population of 1,626,794, or 64.2% of the total population of the State, and elect 54 representatives, or 18.3% of the House.

41. Forty-four of the 169 Towns in the State elect only one representative; such Towns range in size from 600 to 4,-785; their average population is 2,373; their total population is 104,435, or 4.1% of the total population of Connecticut, and they elect 15% of the House.

42. All the plaintiffs are residents of Towns the representatives of which represent in the House of Representatives constituencies more than 25% above the norm.

43. All the plaintiffs except the plaintiffs Maclay and Holland are residents of Senatorial Districts in which the population is more than 25% above the norm.

44. The Court takes judicial notice that the Towns of Waterbury, Naugatuck, Seymour, Ansonia and Derby, located in the Naugatuck Valley, are not markedly different from each other in their basic economy or compositions; similarly, the Towns of Wilton, Weston, Easton and Westport, located in Fairfield County, are not markedly different from each other in their basic economy or compositions.

45. No currently relevant reason is to be found in the record or is known to the Court why the Town of Madison, with a

population of 4,567 persons, has one representative in the House of Representatives, while the Town of Union with a population of 383 persons, has two such representatives.

46. No currently relevant reason is to be found in the record or is known to the Court why the City of Waterbury, with a population of 107,130 persons, has two representatives, while its adjoining neighbor to the south, Naugatuck, similarly situated geographically and economically, but with a population of 19,511, also has two.

47. No currently relevant reason is to be found in the record or is known to the Court why the Town of Westport, with a population of 20,955 persons, has two representatives, while its neighbor to the north, Wilton, similarly situated geographically and economically, but with a population of 8,026, also has two representatives.

48. The amending process, under the Connecticut Constitution, is as follows:

"Amendment To Constitution, Article I, Section 1.
"Whenever a majority of the house of representatives shall deem it necessary to alter or amend this constitution, they may propose such alterations and amendments, which proposed amendments shall be continued to the next general assembly and be published with the laws which may have been passed at the same session; and if two-thirds of each house, at the next session of said assembly, shall approve the amendments proposed, by yeas and nays, said amendments shall, by the secretary, be transmitted to the town clerk in each town in this state, whose duty it shall be to present the same to the inhabitants thereof, for their consideration, at a town meeting, legally warned and held for that purpose; and if it shall appear, in a manner to be provided by law, that a majority of the electors present and voting on such amendments at such meetings shall have approved

such amendments, the same shall be valid, to all intents and purposes, as a part of this constitution."

## CONCLUSIONS OF LAW

1. The complaint herein sets forth a justiciable controversy between the parties. The Court has jurisdiction of this action under 42 U.S.C. §§ 1983, 1988 and 28 U.S.C. § 1343(3) and (4).

2. The plaintiffs herein are persons residing in legislative districts having less representation than they are entitled to, are properly representative of the class in behalf of which they sue and have standing to maintain this action.

3. The defendants herein are the principal persons charged with responsibilities relating to the conduct of elections to the legislature and the defendant Ella T. Grasso is properly representative of the class of persons charged with the duties of conducting elections in the State of Connecticut.

4. The present districting of the Connecticut Senate so debases the voting rights of plaintiffs as to result in an invidious discrimination against plaintiffs who thereby are denied the equal protection of the laws in contravention of the Fourteenth Amendment of the United States Constitution.

5. The present apportionment of the Connecticut House of Representatives so debases the voting rights of plaintiffs as to result in an invidious discrimination against plaintiffs who thereby are denied the equal protection of the laws in contravention of the Fourteenth Amendment of the United States Constitution.

6. So much of Article Third, Section 5, of the Connecticut Constitution as imposes limitations upon equality of population between districts of the Connecticut Senate, being in contravention of the equal protection clause of the Fourteenth Amendment of the United States Constitution, is void and of no effect.

7. Article Third, Section 3, of the Connecticut Constitution, which precludes substantially equal weighting of the votes of all voters in the choice of

members of the Connecticut House of Representatives, being in contravention of the equal protection clause of the Fourteenth Amendment of the United States Constitution, is void and of no effect.

ANDERSON, District Judge, concurs in part and dissents in part in accordance with his dissenting opinions of February 10, 1964 and March 26, 1964.

### JUDGMENT

This cause having been heard October 22, 1963 on its merits, as well as on plaintiffs' motion for partial summary judgment and on the Pinney intervenors' motion to dismiss for failure to state a cause of action; and

The Court having filed opinions February 10, 1964 and findings of fact and conclusions of law herewith; and

The cause having been further heard March 16, 1964 on the form of judgment to be entered; it is

ORDERED, ADJUDGED AND DECREED:

(1) That the present districting of the Connecticut Senate so debases the voting rights of plaintiffs as to result in an invidious discrimination against plaintiffs who thereby are denied the equal protection of the laws in contravention of the Fourteenth Amendment of the United States Constitution.

(2) That the present apportionment of the Connecticut House of Representatives so debases the voting rights of plaintiffs as to result in an invidious discrimination against plaintiffs who thereby are denied the equal protection of the laws in contravention of the Fourteenth Amendment of the United States Constitution.

(3) That so much of Article Third, Section 5, of the Connecticut Constitution as imposes limitations upon equality of population between districts of the Connecticut Senate, being in contravention of the equal protection clause of the Fourteenth Amendment of the United States Constitution, is void and of no effect.

(4) That Article Third, Section 3, of the Connecticut Constitution, which precludes substantially equal weighting of the votes of all voters in the choice of members of the Connecticut House of Representatives, being in contravention of the equal protection clause of the Fourteenth Amendment of the United States Constitution, is void and of no effect.

(5) That defendants John Dempsey, Ella T. Grasso, Donald J. Irwin and Raymond S. Thatcher, their privies and their successors in office, are enjoined from doing any act or taking any steps in furtherance of nominating or holding elections of senators or representatives to the Senate or House of Representatives of the State of Connecticut, and said defendants are further enjoined from certifying or in any other manner declaring that the results of any such nominations or elections are valid or that the legislature of the State of Connecticut is properly or legally constituted, unless *either*

 (a) all senators and representatives are nominated and elected to the Senate and House of Representatives of the State of Connecticut from the state at large, *or*

 (b) all senators and representatives are nominated and elected to the Senate and House of Representatives of the State of Connecticut pursuant to a redistricting of the Senate and a reapportionment of the House to be effected promptly by the General Assembly so that the voting rights of plaintiffs in the choice of members of both houses as guaranteed by the equal protection clause of the Fourteenth Amendment of the United States Constitution

will not be impaired; such redistricting of the Senate and reapportionment of the House by the General Assembly to be done in such manner as to achieve substantially equal weighting of the votes of all voters in the choice of members of both houses and in accordance with the guidelines indicated in the opinion of the late Judge Charles E. Clark included as an appendix to the opinion of this Court filed February 10, 1964.

(6) That execution of the injunction in the foregoing paragraph (5) of this Judgment is stayed until the receipt by this Court of the mandate of the Supreme Court of the United States upon any appeal or appeals taken to the Supreme Court from this Judgment, *provided,* in view of the vital interest of the people of the State of Connecticut in bringing promptly into being a legislature which does not contravene the United States Constitution, that such appeal or appeals to the Supreme Court be prosecuted diligently and expeditiously, including adherence to the following schedule:

(a) notice of appeal (Supreme Court Rule 10) shall be filed within five (5) days, as computed under F.R.C.P. 6(a), from the date of this order;*

(b) notice of appeal shall include a designation (Supreme Court Rule 10(2) (b)) that the entire record in this case be certified by the Clerk of this Court to the Supreme Court, making unnecessary a cross-designation or stipulation with respect to the record (Supreme Court Rule 12);

(c) transcript of entire record as designated in the notice of appeal shall be prepared by the Clerk of

this Court for transmission to the Supreme Court (Supreme Court Rule 12) within the time specified in subparagraph (d) *infra;*

(d) case shall be docketed and record shall be filed with the Clerk of the Supreme Court (Supreme Court Rule 13) within thirty (30) days from the date of filing of the notice of appeal;

(e) jurisdictional statement (Supreme Court Rule 15) shall be filed simultaneously with the docketing of the case and filing of the record and within the time specified in subparagraph (d) *supra;*

(f) Within ten (10) days from the date of the order of the Supreme Court noting probable jurisdiction or postponing consideration of the question of jurisdiction to the hearing of the case on the merits (Supreme Court Rule 16), appellants shall file an appropriate motion with the Clerk of the Supreme Court to advance this case, requesting for good cause that it be set down for argument on the earliest date convenient to the Supreme Court, having regard to the similarity of issues in the instant case and cases now pending in the Supreme Court (Supreme Court Rule 43(3) and (4)).

All parties and their counsel are ordered at every stage of the appeal or appeals from this Judgment and in all respects to expedite proceedings, including strict adherence to the foregoing schedule. The Clerk of this Court is directed to give top priority to preparation of the transcript of record for transmission to the Supreme Court.

(7) That jurisdiction of this action is retained for the entry of such further orders by this Court as may be necessary and proper, including any order required in the ab-

---

* Referring to an order entered April 2, 1964 amending Paragraph (6), subparagraphs (a) through (f), of this Judgment which provides a schedule for expediting an appeal to the Supreme Court.

sence of prompt action by the General Assembly contemplated by paragraph (5) (b) of this Judgment, and as more fully described in the Court's opinion of February 10, 1964.

(8) That plaintiffs' motion for partial summary judgment is denied as moot.

(9) That the Pinney intervenors' motion to dismiss for failure to state a cause of action is denied.

(10) That no costs shall be taxed against any party to this action.

ANDERSON, District Judge, concurs in part and dissents in part in accordance with his dissenting opinions of February 10, 1964 and March 26, 1964.

## MEMORANDUM ON FORM OF JUDGMENT

### PER CURIAM.

The Judgment entered today adjudicates each of the issues presently before the Court. It declares the constitutional rights of plaintiffs (Paragraphs (1), (2), (3), (4)) in accordance with their prayer for a declaratory judgment; it grants an injunction in accordance with their prayer for injunctive relief (Paragraph (5)); it stays execution of the injunction pending appeal to the Supreme Court of the United States (Paragraph (6)), provided such appeal is promptly taken and diligently and expeditiously prosecuted, including an application for the earliest possible argument of such appeal in the Supreme Court—all in accordance with the stated intention of counsel for the prospective appellants; and it reserves jurisdiction (Paragraph (7)) for this Court to enter any further appropriate orders, including any order which may be required after conclusion of the

Supreme Court proceedings if the General Assembly then fails promptly to act as contemplated by paragraph (5) (b) of the Judgment.

It has been suggested that this Court's power is limited to declaring invalid provisions of the State constitution or State statutes because districting of the Senate and apportionment of the House pursuant thereto contravene the Federal Constitution; but that this Court is without power affirmatively to order redistricting or reapportionment. In short, it has been suggested that as a Court we can say what is wrong but not what is right.

We do not understand the powers and duties of this Court to be thus limited. In undertaking to resolve "probably the most difficult governmental problem of our age," [1] we intend of course to fashion such relief as the Supreme Court indicates is within our power and duty to grant. We repeatedly have stated our hope and preference that the necessary redistricting of the Senate and reapportionment of the House be done by the General Assembly rather than by this Court. We still entertain that hope and preference. If confronted, however, with a persistent refusal on the part of the General Assembly to act, we certainly have the power, and may well be under a duty, affirmatively, by a plan formulated by this Court if necessary, to order a redistricting of the Senate and a reapportionment of the House. We devoutly hope it will not be necessary for us to exercise that power. If it becomes necessary, we will not hesitate.

The statutes upon which the jurisdiction of this Court rests confer ample power for the granting of meaningful relief in an appropriate apportionment case.[2] The "suit in equity, or other prop-

---

1. Judge Clark in Valenti v. Dempsey, 211 F.Supp. 911, 913 (D.Conn.1962).

2. The provisions of the statutes upon which the jurisdiction of this Court rests, insofar as relevant, are:
 *42 U.S.C. § 1983*
 "Every person who, under color of any statute, ordinance, regulation, cus-

 tom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law,

er proceeding for redress," referred to in 42 U.S.C. § 1983, the emphasis in 42 U.S.C. § 1988 upon "suitable remedies" for "the protection of all persons in the United States in their civil rights, and for their vindication," the power in 28 U.S.C. § 1343(3) to "redress the deprivation, under color of any State law, * * * of any right * * * secured by the Constitution of the United States," and the power in 28 U.S.C. § 1343(4) to grant "equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote," all reflect a broad mandate of Congress to this Court to provide suitable equitable relief going beyond a mere declaration of infringement of constitutional rights. There is, in our opinion, ample congressional authorization for this Court to take affirmative action in entering a decree of redistricting and reapportionment when anything less would neither be a real "remedy" nor effectively "redress" any deprivation whatsoever.

In Baker v. Carr, 369 U.S. 186, 82 S. Ct. 691, 7 L.Ed.2d 663 (1962), plaintiffs alleged denial of equal protection of the laws through malapportionment of a state legislature resulting in debasement of their voting rights in the choice of members of the legislature. The Supreme Court, having declared it had no

doubt that "the District Court will be able to fashion relief if violations of constitutional rights are found" (Id. at 198), held that "The right asserted is within the reach of judicial protection under the Fourteenth Amendment" (Id. at 237).

In his concurring opinion in the Baker case, Justice Clark said (Id. at 258–259):

"Although I find the Tennessee apportionment statute offends the Equal Protection Clause, I would not consider intervention by this Court into so delicate a field if there were any other relief available to the people of Tennessee. But the majority of the people of Tennessee have no 'practical opportunities for exerting their political weight at the polls' to correct the existing 'invidious discrimination.' * * * The majority of the voters have been caught up in a legislative strait jacket. * * * [T]he legislative policy has riveted the present seats in the Assembly to their respective constituencies, and by the votes of their incumbents a reapportionment of any kind is prevented. The people have been rebuffed at the hands of the Assembly; they have tried the constitutional convention route, but

---

suit in equity, or other proper proceeding for redress."

*42 U.S.C. § 1988*

"The jurisdiction in civil * * * matters conferred on the district courts by the provisions of this chapter * * *, for the protection of all persons in the United States in their civil rights and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies * * *, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil * * * cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be

extended to and govern the said courts in the trial and disposition of the cause * * *."

*28 U.S.C. § 1343*

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

"* * * (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

"(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

since the call must originate in the Assembly it, too, has been fruitless."

Justice Clark continued (Id. at 260):

"If judicial competence were lacking to fashion an effective decree, I would dismiss this appeal. However, * * * I see no such difficulty in the position of this case."

Justice Clark then proposed a reapportionment plan of his own, clearly implying that it is the function of the Court in circumstances such as existed there to order at least the initial reapportionment; for he went on to say (Id. at 260):

"[T]he plan here suggested would at least release the strangle hold now on the Assembly and permit it to redistrict itself."

The situation in Connecticut is strikingly like that found in Tennessee by the Supreme Court in the Baker case. Here, as there, "the majority of the voters have been caught up in a legislative strait jacket. * * * [T]he legislative policy has riveted the present seats in the Assembly to their respective constituencies, and by the votes of their incumbents a reapportionment of any kind is prevented." In Connecticut, as in Tennessee, it is by the votes of incumbent legislators that a redistricting of the Senate and a constitutional amendment for reapportionment of the House are prevented, the power to initiate amendments to the Connecticut Constitution being vested exclusively in the House.[3]

Upon remand from the Supreme Court, the three-judge district court in the Baker case entered an order of reapportionment which had been proposed by plaintiffs; gave defendants a specific time within which to file objections and to file an alternative plan; and stated it would then decide which plan, if either, it would approve, expressing no doubt as to its power to impose a plan. Baker v. Carr, 222 F.Supp. 684, 694 (M.D.Tenn. 1963).

At least one other district court has gone even further than Baker in entering an order of reapportionment of a state legislature. In Moss v. Burkhart, 220 F.Supp. 149 (W.D.Okla.1963), a three-judge district court unanimously entered an "ORDER OF REAPPORTIONMENT", spelling out with particularity the composition of each district for the election of members of the state senate and house of representatives (Id. at 156), after having found that the existing legislature was "either unable or unwilling to reapportion itself" in accordance with the requirements of the equal protection clause of the Fourteenth Amendment. (Id. at 155)[4]

In Davis v. Synhorst, 225 F.Supp. 689, 694 (S.D.Iowa 1964), a three-judge district court, having held unconstitutional as "invidiously discriminatory" certain amendments to the state constitution providing for apportionment of members of the Iowa General Assembly, ordered:

"That this Court will abstain from attempting to impose *at this time* an apportionment plan [,] provided a special session of the General Assembly of the State of Iowa is convened with reasonable promptness and action taken for reapportionment in accordance with the general

---

3. Conn.Const. amend. I, § 1.

4. With respect to its power to enter an order of reapportionment, the court said: "We know, of course, that the function of apportioning the State Legislature is essentially legislative in nature; one which the Courts have never before undertaken; and one from which we may very well be precluded, even in the face of inadequate redress for the deprivation of civil rights. We know that the judicial power to grant redress for deprivation of a civil right is us-·

ually a negative power, effected by conventional injunctive decree. It may well be that the affirmative relief we grant is in excess of our judicial power. If so, we will know in due time, for the questions are squarely presented, and will undoubtedly be authoritatively decided during the next term of the Supreme Court. * * * Meanwhile, we shall proceed on the fundamental premise that equity is never impotent or indolent before the law." (220 F.Supp. at 155)

guide lines for legislative apportionment set out in * * * [the Court's opinion.]" (Emphasis added)

The court reserved jurisdiction "to consider prescribing an interim plan of re-apportionment" in the event the special session was not called within a reasonable time or was fruitless, and to "make such further orders as may be appropriate or necessary * * *." (Id. at 694) The court had no doubt as to its power to grant affirmative relief if the legislature failed to reapportion itself. See also Sincock v. Duffy, 215 F.Supp. 169 (D.Del.1963); Thigpen v. Meyers, 211 F.Supp. 826 (W.D.Wash.1962), pending on appeal (No. 381, this Term); Toombs v. Fortson, 205 F.Supp. 248 (N.D.Ga. 1962).

In the related field of congressional apportionment, a three-judge district court in Bush v. Martin, 224 F.Supp. 499 (S.D.Texas 1963), having held a Texas statute apportioning congressional districts unconstitutional because it was invidiously discriminatory with respect to certain citizens, enjoined state election officials from enforcing the statute and ordered, pending enactment of substitute legislation, that (Id. at 517):

"all Members of Congress for the State of Texas shall be nominated and elected from the State at large."

The majority's order that congressional nominations and elections be at large was sharply criticized by the dissenting judge as "unique in the annals of federal jurisprudence"; as "done without any pleadings on file which would justify, request, or even suggest, this character of relief"; and as done "without any indication whatsoever in the record that a valid apportionment act will not be in effect at the appropriate time." For these reasons the dissenting judge considered the order "to be beyond the judicial power of the Court and violative of the Eleventh Amendment to the Constitution of the United States." (Id. at 520)

The Supreme Court affirmed the district court's decision in the Bush case (Martin v. Bush, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964)), including, presumably, the form of relief there granted, the issue with respect to which was raised by the dissenting judge below (224 F.Supp. 499, 520) and in the jurisdictional statement in the Supreme Court (32 U.S.L.Week 3263 (January 21, 1964)).

The reapportionment cases are not the first to involve affirmative action by three-judge district courts to safeguard constitutional rights. After the Supreme Court's decision in Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954), ordering desegregation of public schools, the case was reargued on the question of the relief to be granted. In remanding the various cases there involved to the three-judge district courts which had originally decided them for the entry of appropriate decrees, the Supreme Court said (349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955)):

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power."

Pursuant to the mandate in the Brown case, the district courts have formulated, and ordered enforced, plans for the desegregation of public schools. In Bush v. Orleans Parish School Board, 205 F. Supp. 893 (E.D.La.1962), for example, the court declared:

"[I]t is the obligation of this Court to order a specific plan of integration which must be adhered to by the [school] Board." (Id. at 898)

Accordingly, the court did enter an order providing for integration under a specific plan. (Id. at 900–901.) See also Mapp v. Board of Education of City of Chattanooga, 203 F.Supp. 843 (E.D. Tenn.1962); Calhoun v. Members of

Board of Education, City of Atlanta, 188 F.Supp. 401 (N.D.Ga.1959).

We have no doubt that there is ample statutory and decisional authority for this Court affirmatively to order redistricting of the Senate and reapportionment of the House.

It may be that, as the dissent contends, the legislature is without power to amend the State constitution. It can, however, legislate on subjects within its competence free from restrictions of the State constitution which are invalid because in violation of the Constitution of the United States.

ANDERSON, District Judge (concurring in part and dissenting in part):

I concur with Clauses 1, 2 and 3 of the decree issued by the majority of the court for the reasons set forth in my dissenting opinion of February 10, 1964.

I disagree with Clauses 4, 5, 6, and 7 of the decree. My principal objections to these clauses of the decree are that they clearly require both Houses of the Connecticut General Assembly to be based solely on population and that they assume that the General Assembly has the power, by itself, to amend the Connecticut Constitution by enacting provisions in substitution for § 3 and § 5 of Article Third, which the court has declared in conflict with the Federal Constitution. It is the position of this dissent, as was set forth more fully in my opinion of February 10, 1964, that it is not unconstitutional for Connecticut to have a legislative branch, one house of which is based upon population, and the other house of which is based upon the unit system of representation, and that it should be left to the choice of the people of the State to decide whether they want a legislature based upon this system or one in which both houses are based solely upon population; and further that this issue cannot be determined and made a part of the Connecticut Constitution by the legislature alone, as if it were passing a mere statute, but must be determined by the people who should have a full and fair opportunity to vote upon this momentous question.

I further question Clauses 4 through 7 of the decree because they do not clearly follow and implement the majority opinion of February 10, 1964 by formulating a specific plan which it will order the State of Connecticut to follow in the event that the Legislature fails to comply with Clause 5(b) of the decree. The decree and the majority's "Memorandum on Form of Judgment" do, however, make it clear that the majority of the court are of the opinion that this is a warranted exercise of the court's power even though it, in effect, constitutes an enactment of a new constitutional provision for the State of Connecticut which has never been passed upon by the voters of the State. It is hoped that this will be a sufficient posing of the very important issue of the extent to which this court is warranted in going in ordering affirmative relief in the circumstances of this case so that the Supreme Court will rule upon it.

I further disagree with the terms of the decree because they are not sufficiently explicit in defining what the defendants are to do or refrain from doing in the event that an appeal is not expedited but is taken in the ordinary course under the rules. If the prompt appeal is taken, it appears that the situation is simply to remain as it is. If, however, a prompt appeal is not taken, then the injunction is not stayed and it becomes operative. In that event the defendants are at least not prohibited from and are perhaps impliedly authorized to conduct an election of representatives and senators from the State at large. But if this is done what determines the number of the representatives there are to be in the membership of the house? The present number of 294 is derived from § 3 of Article Third of the Connecticut Constitution which the court has declared unconstitutional. Do they mean this portion will not be treated as unconstitutional? If so, how can they escape the conclusion that the practical impossibility of each elector's being forced to

consider and pass upon 588 candidates for the House and 72 candidates for the Senate, or a total of 660 candidates for the Legislature, in fact deprives the great majority of electors of a fair opportunity for an intelligent exercise of their franchise and a reasonable opportunity to ascertain and vote for any kind of suitable representation of their interests and that they will suffer far more in deprivation of a fair exercise of their voting rights, on any just balancing of the equities, than have the plaintiffs through unequal protection of the laws. As an equitable proceeding how can this court entertain any such theory. Also as a practical matter the laws requiring the use of voting machines would have to be repealed or radical changes made in the election laws.

The other alternative, i. e., that delineated under Clause 5(b), cannot lawfully be complied with because, as above stated, the General Assembly does not have the power to redistrict and reapportion the Legislature. That can only be effected through an amendment to the State Constitution which must be passed upon by the people. The operation of the injunction prohibits preparation for and the election of a 1965 Legislature based upon the present Connecticut Constitution and statutes. Whether the present members of the Legislature can hold over depends upon the interpretation of § 9 of Article Third of the Connecticut Constitution and whether, by enjoining the Governor and Secretary of the State "from certifying or in any other manner declaring that * * * the Legislature of the State of Connecticut is properly or legally constituted", this decree will prevent them from performing their duties in connection with convening the 1965 Session or whether the Legislators may convene themselves, are left as unanswered questions.

A few additional comments should be made relative to the majority's "Memorandum on Form of Judgment." Insofar as its argument that the court was not limited to issuing a restraining injunction but had some power to order affirmative relief was intended as a reply to my dissenting opinion of February 10, 1964, it should be reiterated that the dissent did not take a contrary position but recommended that the court direct the Governor "to call a Special Session of the General Assembly of the State of Connecticut to take the necessary steps to place before the voters of the State proposals to amend * * * the State Constitution." It was the position of the dissent that the court was not warranted in going beyond this, and it strongly objected to the majority's assuming authority, in effect, to draft new constitutional provisions for the State of Connecticut and order the State to comply with them. There comes a point in the course of attempting to give appropriate relief in a case of this kind where a court of limited jurisdiction, such as this, runs into the strictures contained in Amendments 9 and 10 to the Constitution of the United States, beyond which it is not warranted in going.

The memorandum deals at some length with Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and finds that the situation in Connecticut is strikingly like that found in Tennessee. The striking distinction, however, which the majority do not mention or even appear to consider is that in Baker v. Carr, supra, the plaintiffs were simply endeavoring to require the Tennessee Legislature to comply with Tennessee's own Constitution. In Connecticut it is Connecticut's Constitutional provisions which are in conflict with the Fourteenth Amendment to the Federal Constitution. In fact, in Baker v. Carr, supra, the Court explicitly said:

"Since we hold that appellants have * * * a cognizable federal constitutional cause of action resting in no degree on rights guaranteed or putatively guaranteed by the Tennessee Constitution, we do not consider, let alone enforce, rights under a State Constitution which go further than the protections of the

Fourteenth Amendment." 369 U.S. at 195, n. 15.

Thus the affirmative relief contemplated in Baker v. Carr is a decree ordering compliance with Tennessee's own Constitution, as was specifically requested in the complaint in that case. 369 U.S. at 195.

Orders which in effect delineate changes to be made in a State's Constitution are in a much more delicate area and more greatly threaten the division of powers than a finding that a citizen of a State is deprived of the Equal Protection of the Law where a State legislature refuses to comply with the State's own Constitution.

The majority cites, in support of the extent of the affirmative relief which it claims it has authority to grant, the case of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); but the degree of relief which the Supreme Court felt should be given in ordering desegregation of public schools is not necessarily the measure which it would use in passing upon the extent to which a court is warranted in going in effecting new state constitutional provisions, particularly where no opportunity whatever had been afforded the people of the State to pass upon such constitutional amendments.

The cases Moss v. Burkhart, 220 F.Supp. 149 (W.D.Okla.1963) and Davis v. Synhorst, 225 F.Supp. 689 (S.D.Iowa 1964) were already cited and discussed in my dissenting opinion of February 10, 1964. Of the other cases cited in connection with them only Sincock v. Duffy, 215 F.Supp. 169 (D.Del.1963) concerns a conflict between a State Constitution and the Federal Constitution; the others are cases where State legislatures have refused to abide by the provisions of the State's own constitutions. The majority refer to the case of Bush v. Martin, 224 F.Supp. 499 (S.D.Texas 1963); this has no bearing on the present case because Bush v. Martin, supra, deals with congressional redistricting. The Federal Constitution provides that the number of congressmen from each State shall be based upon population. Each State is permitted to set up by statute districts from which each congressman is to be elected. If those districts become unequal in population and, therefore, invalid under the Fourteenth Amendment, as was the case in Bush v. Martin, then the State may nevertheless send the same number of congressmen to the Federal House of Representatives. In the absence of districts, the congressmen are elected at large. This is an obvious and long standing result. In the congressional situation there is a valid Federal constitutional provision giving the States the right to elect congressmen at large. This, however, has no bearing upon the issue of State legislative redistricting and apportionment where, as here, the State constitutional provisions creating the legislative body to which the elected representatives are to be sent have been invalidated, and where there is nothing to replace those State constitutional provisions.

In conclusion the dissenting opinion of February 10, 1964, is reaffirmed and made a part hereof by reference.

MEMORANDUM OF DECISION ON MOTION TO INTERVENE BY THE TOWNS OF FRANKLIN AND SALEM, AND ANTHONY CARBONI AND ELMER P. CHAPPELL

The towns of Salem and Franklin and two individuals, their First Selectmen, claim they have a right to intervene in this litigation because they are indispensable parties. The basis of this contention is that the rights and interests of these small towns will be affected by any decree rendered in this case, and there is no party in the litigation purporting to represent the small towns.

If Salem and Franklin are correct, all the towns in Connecticut would have to be represented in this litigation. Small towns, large towns, middle-sized towns, rural towns, urban towns, old towns, and new towns would all be necessary parties. As it now stands, none of the parties or intervenors are actually speaking for

the towns qua towns. But towns qua towns do not have a substantial interest in this matter. To be sure, the Connecticut Constitution provides that towns shall be entitled to send one or two representatives to the general assembly, but all this means is that citizens of the towns shall vote for one or two representatives. The town as a corporate municipality has no more interest in the outcome of the litigation than it would if it were a senatorial district whose lines were being attacked as unfair. The town, in the sense of its selectmen or representatives, does not elect or select a representative; that is a function of the individual voter. Conn.Const., Art. Third, Secs. 7, 8.

The plaintiffs in this case attack that portion of the Connecticut Constitution which apportions the House according to town lines. There is no direct attack on the towns. Any interest the towns have is collateral via maintaining the effectiveness of their citizens' votes. How or why the decree would be binding on the towns is a little hard to see.

As the towns of Franklin and Salem concede in their brief (p. 12), no court has yet decided explicitly what parties are indispensable in a reapportionment case. Yet in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), where the Supreme Court invalidated Georgia's county-unit voting system, the Georgia counties were not parties to the suit. In Sims v. Frink, 208 F.Supp. 431 (M.D.Ala.1962), the Alabama counties were not parties to the suit to reapportion the legislature though the Alabama Constitution gave each county one representative. There is no perceptible difference between the interests of the Alabama and Georgia counties in those cases, and the Connecticut towns in this case. A survey of the recent reapportionment cases indicates that the essential parties defendant are the state officials charged with administering the elections of the state. Indeed, in Mann v. Davis, 213 F.Supp. 577 (E.D.Va.1962), the governor and attorney general of Virginia were dismissed as parties defendant because they had no special relation to the elections in the suit, while in League of Neb. Municipalities v. Marsh, 209 F.Supp. 189 (D.C.Neb.1962), the mayors of cities were considered improper parties in their official capacities.

The towns are in effect election districts for the purposes of this suit, and have no right to intervene as necessary parties. Since their motion is untimely, it may quite properly be denied. See Thigpen v. Meyers, 211 F.Supp. 826, 827 n. 2 (W.D.Wash.1962), where the motion of the state Grange to intervene four days before trial was dismissed as untimely.

The Pinney intervenors, two of whom are electors in towns of less than 5,000 population, are already ably and articulately representing the small town voters.

The motion to intervene is denied.

ANDERSON, District Judge (dissenting).

It is my opinion that the motion should be granted so as to permit intervention by the individual petitioners, representing electors of the 152 towns with populations of 41,662 or under, which includes Salem and Franklin, and I also would grant leave to an equal number of qualified persons to intervene to represent the electors of the 17 towns with a population in excess of 41,662. For the purpose of this action the small towns or rural areas should be defined as the 152 municipalities with populations of 41,662 and under, and the cities or urban areas should be defined as the 17 towns having populations in excess of 41,662. If both houses of the General Assembly were based purely on population, the cities with populations over 41,662 would contain a majority of the population of the State and would, therefore, control both houses of the General Assembly.

As the basic issue in this case is whether or not the unit system of representation in one house of a bicameral legislature is unconstitutional even when the other house is based purely upon population, the electors of the small

towns have at stake whether or not they can retain sufficiently effective representation in the General Assembly to preserve their power to manage their local affairs.

They are the real parties in interest. Although the court has approached and dealt with the issues in this case solely as difficult problems in constitutional law, unrelated to either immediate or long range political party consequences, the intervenors have been perfectly candid in letting it be understood that they have interests in the case stemming from their identification with particular political parties. Moreover, the plaintiffs take a position adverse to the petitioners, and it is certainly not clear that their claims for relief and for remedial recommendations are entirely consistent with those desired by the electors of the large urban centers in the role of unlimited controllers of legislative power in Connecticut, who, as such, are also unrepresented. This is not to suggest that the parties and the intervenors have not made highly competent presentations or that they have not contributed tremendously to the determination of the issues in the case because the contrary is certainly true. It is to say, however, that their interests are not squarely identified with those of the petitioners and the voters similarly situated in the large cities.

Although in modified form the membership of the Houses of the Connecticut General Assembly has been based upon population in the upper house and upon the unit system in the lower house, the Attorney General has taken a position adverse to the constitutionality of any use of the unit system. In many jurisdictions, where similar issues have been before the courts, the attorney general has appeared in the role of a defender of the existing state system; but he is certainly not required to do so. This is only mentioned because his position on the issues in this case became clear only

recently and affords a reason why the petitioners should not have been expected to seek intervention earlier. It also provides an added reason why the petitioners should be permitted to intervene because no one represents small town interests, as such, versus urban areas, as such. Small town electors who belong to the Democratic Party, or no party, and big city electors who belong to the Republican Party, or no party, should be able to have their interests represented uncolored by considerations of the immediate advantage or disadvantage to any political party.

Constitutions are made for the centuries and while there are probably very few, the provisions of which have been unaffected by partisan political concerns, the main intention and purpose has been through them to establish a system of government, responsive to the needs of the people and providing allocations of governmental power with a system of checks and balances to insure the continuance of that responsiveness and protect the liberties of the people. They are designed to embody the fundamental principles of the state government and to have a high degree of stability and permanency. They are not intended, like statutes, to change to meet every significant alteration in social or economic conditions. They should not be amended solely to meet the needs or desires of any political party. In fact, constitutional provisions which may appear to aid a political party at one time may, twenty years later, be quite adverse to its interests.

Electors of the small towns, as such, have their interests vitally affected by the issues in this case. They are not represented now, nor is there adequate representation for their opposite numbers in the large cities. The individual petitioners and an equal number from the large cities, should be permitted to intervene to present their cases unaffected by extraneous interests.